# UNITED STATES *v.* UNITED SHOE MACHINERY COMPANY OF NEW JERSEY ET AL.

## APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 207. Argued March 16, 19, 20, 21, 1917; restored to docket for reargument May 21, 1917; reargued January 11, 14, 15, 1918.—Decided May 20, 1918.

Where the evidence is strongly conflicting, especial weight attaches to the findings of a trial court whose judges saw and heard the witnesses.

Applying this principle, the court holds, with the court below, that the evidence does not sustain the charges of unlawful restraint of interstate commerce in shoe machinery, and monoply thereof, in the formation and conduct of the United Shoe Machinery Company.

In determining whether a combination restrains interstate commerce injuriously to the public, the foremost inquiry is whether the interests brought together were competitive.

Where machines were patented and, though used collectively in the making of a single product, were so far distinct in their functions that they were practically noncompetitive, a common control over their manufacture and use; *held* not obnoxious to the Anti-Trust Act.

Statements in notices to shareholders and in an agency contract, made by participants in a combination, explaining its object, *held* not to establish unlawful intent, in view of the evidence of what was done, publicity of the statements when made, lapse of time and inaction of the Government.

Lapse of time, changes of condition due to it and to the progress of the art, the development of high industrial efficiency, difficulty or impossibility of restoring antecedent conditions and injurious effects that would follow the attempt to grant the relief prayed, are matters to be considered in determining from conflicting evidence whether a combination should be dissolved.

Unconnected purchases of certain businesses with patent rights, made by the Company after its formation, are *held*, on conflicting evidence, not to have been intended, nor to have had the effect, of restraining competition illegally or to have brought it obnoxious power. Generally, one has the right to purchase patents for the protection

or improvement of his own inventions and business, and for the prevention of patent litigation, and such purchases should not be adjudged to have stifled competition unduly upon speculative estimates of the potential competitive power of new and untried inventions.

Upon similar considerations, certain contracts for assignment of future inventions are also held legitimate.

The charge that the Shoe Machinery Company's power has been oppressively used is not sustained.

The patent law gives the patentee the right to exclude others from the use of his invention, absolutely or upon terms. The exertion of this right within the field of the patent law is not an offense against the Anti-Trust Act.

The principle, announced in recent cases, that when a patented article is sold it passes beyond the patent monopoly, has no application where there is no conveyance of title but a *bona fide* lease of the article.

In a suit to set aside leases of patented machines upon the ground that they exceed the rights of the lessor as patent owner and operate to produce results obnoxious to the Anti-Trust Act, *semble*, that the lessees may be necessary parties.

Defendant supplied its sets of patented machines to shoe manufacturers on a royalty basis under a system of leases, of a uniform term of 17 years, with conditions for use of each machine to full capacity; for leasing others of lessor as more work became available; for use to exclusion of, and forbidding use on work coming from, machines not so leased; requiring lessee to obtain certain supplies from lessor only; permitting lessor, for breach of condition in any lease, to forfeit it and all others, and requiring lessee thereupon to return machines and pay a charge. *Held:* (1) Upon the evidence, that the leases were entered into by the lessees voluntarily and without coercion, and that their legality must be determined apart from a general charge of illegal dominancy by the corporation which the evidence failed to sustain. (2) Upon the evidence, that the purpose of the system was to make the sets of machinery available to customers on easy terms and promote their efficient and productive operation, in connection with an accessory service furnished by the company, and insure adequate royalty returns. (3) That the conditions were within the lessor's patent rights, and not violative of the Anti-Trust Act.

222 Fed. Rep. 349, affirmed.

SUIT to dissolve an asserted combination and conspiracy between certain companies, makers or dealers in boot and

shoe machinery, and the officers of the companies; also to have declared illegal and canceled certain leases and agreements, charged to be the means of the combination and conspiracy whereby, through control over the manufacturers of boots and shoes, competition has been prevented, inventive genius subjected to the designs of the combiners and conspirators, and auxiliary machines and accessories controlled and made subsidiary.

The charges are met with denials, with justification that the conduct which is asserted to be illegal was in promotion of trade, in natural development of business and in strict compliance with modern trade progress; indeed, that there was simply the fusion of independent and noncompeting businesses, each differing from the other, and the combination of various elements of machinery covered by United States patents and all of it relating to the same art and the same school of manufactures. And that the leases and agreements were but the exercise of patent rights, wholly legal and indeed necessary.

These contentions are displayed in a bill which occupies 46 pages of the record and an answer of equal volume.

The statute of limitations is also pleaded in defense, the greater part of the acts charged being alleged to have taken place more than 6 years before the filing of the petition.

Three judges sat in the case, who heard the testimony in open court. Upon its completion and consideration a decree was entered dismissing the bill. Each judge rendered an opinion exhibiting the case from a different angle, and the opinions, taken together, display all the phases of the case and the considerations and issues involved. 222 Fed. Rep. 349.

*Mr. H. La Rue Brown*, Special Assistant to the Attorney General, with whom *The Attorney General, The Solicitor General, Mr. Assistant to the Attorney General*

*Todd,* and *Mr. Leo A. Rogers,* Special Assistant to the Attorney General, were on the briefs for the United States.[1]

*Mr. Charles F. Choate, Jr.,* and *Mr. Frederick P. Fish,* with whom *Mr. Malcolm Donald* was on the briefs, for appellees.

*Mr. Frank Y. Gladney,* by leave of court, filed a brief on behalf of General Shoe Machinery Co., successor to Boylston Manufacturing Co., as *amicus curiæ.*

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

The charge of the bill is that defendants, not being satisfied with the monopoly of their patents and determined to extend it, conceived the idea of acquiring the ownership or control of all concerns engaged in the manufacture of all kinds of shoe machinery. This purpose was achieved, it is charged, and a monopoly acquired, and commerce, interstate and foreign, restrained by the union of competing companies and the acquisition of others. And that leases were exacted which completed and assured the control and monopoly thus acquired.

But this charge of comprehensive trade dominance was modified in the course of the trial. The Government disclaimed the assertion of such extensive culpability and confined its contention to machinery adapted to the bottoming of shoes (attaching soles to uppers), machines called clicking machines (cutting-out machines), and eyeletting machines (sufficiently indicated by name), and

---

[1] *Mr. H. La Rue Brown* and *Mr. Constantine J. Smyth,* Special Assistants to the Attorney General, argued the case for the United States at the first hearing. The briefs of counsel deal largely with the facts, and are too extensive for proper representation here.

declared that if the bill did not so limit the actual monopoly counsel would agree so to limit it.

Of course, we agree with the Government that defendants cannot be discharged from all guilt merely because they leave open some branches of the business to the enterprise of others, or, as the Government puts it, "that a limited field is as yet open to competition." But in view of the large design attributed to the defendants and the illustration of what it is contended they accomplished, it would be interesting if not instructive to be told when their large scheme was abandoned or broke down, even though it may now be said to be an unimportant detail, since the trial court has decided that neither the greater nor lesser scheme was established by the evidence.

The conclusion, however, is contested, and in description of what is now contended, the Government says that "the end which avowedly was sought by the organizers of the United Company was 'the control in one corporation, both in the United States and in foreign countries, of the efficient types of shoe machinery.'" And, further, after stating the business of defendants to be that "of supplying machines used in the manufacture of shoes," and the restraint of interstate and foreign commerce in certain of the machines, it is said: "The subject matter of the action, therefore, is the effect of the things done by the defendants upon the trade between manufacturers of machines used in the manufacture of shoes and the manufacturers of shoes." And in further display of the interest which attaches to the issues, it is said: "Shoes are made in every section of the Union" and "it is obvious that supplying important machines for such an industry must be an exceedingly important part of the interstate trade and commerce of the United States."

And there are contentions as to the dominance achieved. Indeed, it is asserted somewhat fervidly that the United Company "is absolute monarch of the industry" and

that "no competitor can exist unless for its own pleasure or policy it withholds its destroying hand."

There are opposing contentions no less fervidly urged. There is denial of the purpose attributed to the defendants or the possession or exercise of baleful power, and the insistence that the United Company is a union of non-competing businesses conducted under letters patent, effecting through the resources thus acquired greater economies in manufacture and greater efficiency of machinery and "in other ways perfec'ing the shoe-maker's art"—advantages not engrossed by the company but inuring to its patrons and through them to the wearers of their product, a finished shoe.

In final answer to the charge of the Government the comprehensive declaration is that the shoe machinery industry is not one open to everybody on equal terms. It is one of patents. And the company's power, if it have power, is not that of combination but the power of the superiority of its inventions—the effect and demonstrated supremacy of its mechanical instrumentalities.

The contentions could not well be more antagonistic, upon each of which there was conflicting testimony, and the important fact is to be borne in mind that it was given in open court (except as to certain contentions about patents, their scope and validity).[1] The fact justifies defer-

---

[1] During the trial a discussion came up about patents. The presiding judge intimated that the court did not desire to take up the patents themselves but would send them to an examiner. It was stated by counsel in the case that the matter was important. But the court made a distinction between a "patent question" and a "patent controversy"—good faith being an element of the latter—and stated that the latter would not be included in the hearing before the examiner, but would be heard in open court. The court then ordered the taking of testimony of both parties before the examiner as to that section of the bill which charged an unlawful extension of the patents to perpetutate their monopoly at the expense of boot and shoe manufacturers and to use them to acquire a complete monopoly of all kinds

ence to the findings of the trial court. *Adamson v. Gil-
liland,* 242 U. S. 350, 353.

There are two accusations against the defendants. One
is that at the very outset they combined competing com-
panies and subsequently acquired others, § 1 of the Act
of 1890 [1] being thereby offended. The other is a monop-
olization of the trade in violation of § 2 of that act. And
it is charged, as we have said, that certain leases and li-
cense agreements are the instruments which consummate
both offenses.

The offense of combination was committed, it is con-
tended, February 7, 1899, at which time seven shoe ma-
chinery companies were consolidated into the United
Shoe Machinery Company of New Jersey, a corporation
organized for that purpose. The companies were: Good-
year Shoe Machinery Company, International Goodyear
Shoe Machinery Company, Consolidated & McKay Last-
ing Machine Company, McKay Shoe Machinery Company,
Davey Pegging Machine Company, Eppler Welt Machine

---

of shoe machinery. The examination took place and it was the usual
battle of experts, and the conflicts are recorded in a volume of more
than eight hundred pages. Their ultimate test, however, and the ef-
fect of the patents is the testimony delivered in open court.

[1] "Sec. 1. Every contract, combination in the form of trust or other-
wise, or conspiracy, in restraint of trade or commerce among the several
States, or with foreign nations, is hereby declared to be illegal. Every
person who shall make any such contract or engage in any such com-
bination or conspiracy, shall be deemed guilty of a misdemeanor, and,
on conviction thereof, shall be punished by fine not exceeding five thou-
sand dollars, or by imprisonment not exceeding one year, or by both
said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or attempt to monop-
olize, or combine or conspire with any other person, or persons, to monop-
olize any part of the trade or commerce among the several States, or
with foreign nations, shall be deemed guilty of a misdemeanor, and,
on conviction thereof, shall be punished by fine not exceeding five
thousand dollars, or by imprisonment not exceeding one year, or by
both said punishments, in the discretion of the court."

Company and the International Eppler Welt Machine Company. The last two companies were acquired by the new company after its formation, but they may be regarded as constituent companies. The businesses of these companies were conveyed to the new company, the businesses being those of manufacturing, selling and leasing and dealing in shoe machinery, including patents of the United States and other countries.[1] A more

---

[1] There is apparent confusion in the brief of the Government. In one place it is stated that the United Company was the consolidation of the businesses and properties of seven companies which were taken over as going concerns, to-wit: Goodyear Shoe Machinery Company, International Goodyear Shoe Machinery Company, Consolidated & McKay Lasting Machine Company, McKay Shoe Machinery Company, Davey Pegging Machine Company, Eppler Welt Machine Company, and International Eppler Welt Machine Company.

In another place the organization of the United Company is stated to be the merger of four companies—Goodyear Company, Consolidated & McKay Company, Eppler Company and the McKay Shoe Machinery Company—and resulted in the immediate suppression of competition between those companies and dominating "to the point of practical exclusion the important field of supplying the principal and essential machines necessary in the manufacture of shoes."

However, in the conclusion of the Government's brief it contends that it has established "that there existed vigorous competition between three of the companies merged in the organization of the United Company, and that the fourth company, which at any moment might have become a competitor, was taken in for the purpose and with the effect of furthering the unlawful scheme of the combination thus brought into being." The fourth company referred to is no doubt the McKay Shoe Machinery Company.

The immediate results were, it is contended—

"(1) The suppression of the actual and of the potential competition in lasting machines theretofore existing, between the Consolidated & McKay Company and the Goodyear Shoe Machinery Company. It created a monopoly in lasting machines.

"(2) The suppression of the actual and of the potential competition between the Goodyear Shoe Machinery Company and the Eppler Welt Machine Company. It created a monopoly of welting and outsole stitching machinery.

particular distinction we do not deem it necessary to make.

The first question is, Were the companies in competition? It confronts us at the outset; all other considerations are dependent upon it. As an element in the answer to it we must revert to the admission that the charge of combination is only as to machinery for bottoming shoes— that is, the uniting of the sole to the upper—an operation which might be called "simple" if the complexity of this record did not contradict it and if we were not told that the letters patent covering the machinery for the operation are too great in number for explanation or enumeration. It is said that on certain classes of shoes over 100 different operations are performed by different machines. And the Government has taken pains to tell us how far "the mysteries of the shoemaker's art and the variations between different methods of making shoes" are outside of the understanding of the purchaser of them. To him, it is said, "shoes are shoes, except as they differ in appearance, comfort, wearing qualities and price." But to the manufacturer distinctions multiply and to the production of a shoe a complete line of machinery is necessary. Indeed, the Government makes the mystery of the art and the necessity of the instrumentalities, in part, the basis of its argument.

---

"(3) The absolute prevention of future competition between the McKay Shoe Machinery Company, the Goodyear Shoe Machinery Company, the Eppler Welt Machine Company, and the Consolidated & McKay Comp.

"(4) The creation of an absolute and complete monopoly in lasting, pegging, welting, outsole stitching, heeling and metallic fastening machines.

"(5) The creation of an organization with vast resources whose control of many different types of machines necessary to the shoe manufacturing industry gave it a power to extend and intrench its monopoly which none of its constituent companies, however successful, could approach."

We are therefore admonished at once of the complexity
of the case and the maze of mechanical technicalities into
which we should be plunged in estimating the evidence
if we had not the guidance of the opinions of the judges
of the trial court.  The court found, as we have said, that
the companies were not in competition at the time of their
union in the United Company, and based the finding not
only upon the testimony of witnesses but the uses of the
machines of the respective companies and their methods
of operation.  The testimony was conflicting, it is true,
and different judgments might be formed upon it, but
from an examination of the record we cannot pronounce
that of the trial court to be wrong.  Indeed, it seems to
us to be supported by the better reason.  We should risk
misunderstanding and error if we should attempt to pick
out that which makes against it and disregard that which
makes for it and judge of witnesses from their reported
words as against their living presence, the advantage
which the trial court had.

The Government, however, urges two circumstances
which it contends corroborate its oral testimony and
against which it asserts that "literal denials of specific
intent to restrain trade are of no significance."  But there
was more than literal denials.  There were detailed rep-
resentation of the condition of the trade and explanation
of the machines convincing, as we have seen, in its strength
and the confirmation it received.  Let us, however, con-
sider the instances upon which the Government relies.
The most important of them is a circular letter,[1] sent by

_____

[1] "Plaintiff's Exhibit 152.

"*To the Stockholders of Goodyear Shoe Machinery Company:*

"BOSTON, MASS., *Feb. 8, 1899.*

"The great advantages to be secured by the control in one cor-
poration, both in the United States and in foreign countries, of the
efficient types of shoe machinery, have been for several years rec-
ognized by the officers of the principal shoe-machinery companies.

the directors of the Goodyear Company to its stockholders, which set forth that great advantages were to be secured by the control in one corporation of the most efficient types of shoe machinery and that the directors and large stockholders had been in negotiation to accomplish that end; and further that the United Company would from time to time acquire other shoe machinery properties either by direct ownership or by purchase of shares of their stock. Also a like declaration [1] in a contract with its agent in Australia.

For more than a year your directors and large shareholders have been in negotiation to accomplish this end.

"After a thorough investigation of the financial condition and the business of the shoe-machinery companies named below, the organization of a corporation has been effected under the laws of the State of New Jersey, to be known as United Shoe Machinery Company.

"The United Shoe Machinery Company has already contracted for more than a majority of the capital stock of Goodyear Shoe Machinery Company, Consolidated & McKay Lasting Machine Company, McKay Shoe Machinery Company, Goodyear Shoe Machinery Company of Canada, International Goodyear Shoe Machinery Company, Eppler Welt Machine Company, International Welt Machine Company, Davey Pegging Machine Company, besides stocks in other shoe-machinery companies, letters patent, and other property.

"The United Company will also from time to time acquire other shoe-machinery properties, either by direct ownership or by purchase of shares of their stock."

[1] "Plaintiff's Exhibit 189.

"Whereas the United Company has acquired control of the boot and shoe and leather working machinery made by the following named corporations doing business in said Boston, namely:

"Goodyear Shoe Machinery Company, Consolidated & McKay Lasting Machine Company, McKay Shoe Machinery Company, Eppler Welt Machine Company, Goddu Metal Fastening Company, Gordon Staple Lasting and Tacking Company, Davey Pegging Machine Company, Gem Flexible Insole Company, Boot & Shoe Sole Laying Company, and contemplates acquiring the control of other lines of boot and shoe and leather working machinery and boot and shoe findings, except leather, linings, lasts and finished boots and shoes. . . ."

The circular and agreement could not, of themselves, give character to the constituent companies. It is evident, therefore, that both of them need comment to give them sinister significance, and the innuendo of the Government is that they meant not only that great competing companies had been united, but that other companies—competitors, it may be—would be acquired. It would be a stout credulity that could accept this explanation against the counter considerations. We cannot put out of mind that according to the Government, in repeated assertions, the United Company in 1899, twelve years before the suit was brought, jumped into the field full-panoplied in monopolistic power and started immediately on its career of dominance and restraint of trade. But to preclude the denial of the assertions it is now said that, in stock circulars and trade agreements, the company trumpeted its might and illegal enterprise to two continents. Deliberate guilt—we say deliberate guilt, for it is not a question of ignorance or imbecility—is usually not so bold. It masks its purpose to hide it from prevention and penalty. If it may be asserted that the trade agreement was in secret, certainly the circular letter to the stockholders committed the scheme to publicity.

We cannot, therefore, accept the explanation of the Government. Its implications discredit it. It implies that there was governmental supineness for a long time or an extraordinary oversight of conspicuous, indeed vaunted, criminality. Neither can be accepted. And we are persuaded that the circular and agreement were not intended nor regarded to be the avowal, as contended by the Government, of monopoly, achieved or to be achieved, but simply the business expression and foresight of the advantages which would result from the concentration in one management of instrumentalities which, however different, supplement one another in the creation of a shoe.

We have given the explanation of the Government im-

portance because the Government has done so. And we
have only answered in estimation of what the circular
and agreement are worth as avowals of intention. Of
course, if the Government is right, they are unimportant
circumstances; the demonstration of the United Com-
pany's purpose is complete without them; for the Govern-
ment contends that the constituent companies were in
open competition and that their union resulted in the
"immediate suppression of the actual and potential com-
petition" in shoe machinery and the "creation of an or-
ganization with vast resources" which "gave it a power
to extend and intrench its monopoly which none of its
constituent companies, however successful, could ap-
proach." If this were a fact it would not need the confir-
mation of words.

The second circumstance cited by the Government is
that before the union of the companies their machines had
a flexibility in use that the testimony of defendants does
not now ascribe to them, and that this was declared in
advertisements. We are not disposed to give much im-
portance to the circumstance. It may be that there was
a certain interchangeability in the described machines,
but, in the opinion of the trial court, there was, notwith-
standing, no practical competition between them. We
can add nothing to what determined its judgment or to
the detailed comparison and explanation of the machines
made in its opinions. Indeed, we might rest this branch
of the case on those opinions. They were considerate of all
the elements of the Government's contentions and the op-
posing contentions and tested the machines, their same-
ness and difference and respective efficiency, by the pur-
poses for which they were designed by the inventors and
employed in the trade and by the explanations made of
them.

In considering the competition of the machines and in
estimating the defendants' acts in uniting the companies,

it is to be observed that the machines were all made "under letters patent of the United States and other countries," were owned by the companies, and covered improvements made by the companies from time to time and embodied in the machines, which were so far developed that they were in 1899 principally in use by shoe manufacturers in the kinds of work to which they were respectively adapted. The patents and the businesses passed to the new company, but necessarily were the same in its hand as before. In other words, the patents did not lose their distinction, nor the machines their difference; and to dwell upon the percentages of manufacture is misleading. Of a like situation we said in *United States* v. *Winslow,* 227 U. S. 202, 217, and said of it in answer to the charge against the combination here involved, that we could "see no greater objection to one corporation manufacturing seventy per cent. of three noncompeting groups of patented machines collectively used for making a single product than to three corporations making the same proportion of one group each. The disintegration aimed at by the statute [Act of 1890] does not extend to reducing all manufacture to isolated units of the lowest degree." Or, as expressed by one of the judges in the court below, "The combination was not unlawful so far as it did no more than put the different groups of noncompeting patented machines into one control. . . . It was not unlawful unless, to an extent injurious to the public interest, it destroyed competition."

And it was held that competition was not destroyed to the designated extent. Indeed, the court was repelled, as it might well have been, by the consquences of so holding on account of the change of conditions, the union of the companies not having been questioned by the Government for twelve years and large investments having been made not only by the company but by the public.

The lapse of time, indeed, may not condone the offense

if offense there was. It, however, may call offense in question and be an element in the refutation of accusations long deferred, or determine against particular reme-. dies. It is to be remembered that a dissolution of the offending companies is prayed and that each of them be "separated into such parts that no one of them will constitute a monopoly . . . of the shoe machinery business," or that receivers be appointed to take possession of them and their assets, business and affairs and wind them up and "bring about conditions in trade and commerce among the States and with foreign nations in harmony with law." If there be need for this the difficulties of achievement should not deter; but the difficulties may admonish against the need and demonstrate that the situation may be remediless or to be redressed at a cost too great. Therefore, considering the remedy prayed, which is extreme, even in its mildest demands, we may ask, what of the investments that have been made during these years of extension and development of the new company's business? What of the machines that have become obsolete and the new ones that have been developed? What of the patents that have expired and the new ones that have not yet run out, and how distribute them? And what of their effect when distributed? Will their monopoly cease, or be regarded as an instrument of illegal purpose and forfeited as a deodand? How pick out from the new conditions the conditions of 1899 and restore them and the art of that time and rehabilitate the businesses that are alleged to have ceased to exist or to have become merged in the United Company? How from the complexity only thus suggested, not displayed, "bring about conditions in trade and commerce" in shoe machinery "among the States and with foreign nations in harmony with law," which is the ultimate resource of the Government for this part of the case? How radical should the disintegration be? Or should there be a sale in en-

tirety and not in parts? And, if in entirety, will the purchaser get an immunity that the companies did not have? A sale in entirety would seem to be absolutely necessary to preserve the works at Beverly. And yet how can that be done if there be a dissolution of the company and a distribution of machines? On the other hand, the idea is repellent that so complete an instrumentality should be dismantled and its concentration and efficiency lost. It has been testified that the purpose of the organization was the consolidating of all the machines in one modern factory and the standardizing of them. This purpose has been attained. The company employs there 4,000 men.

There are, however, certain instances of acquisition which may be said to give confirmation to the charges of the Government and justify the demand for redress, at whatever cost or disaster to the offenders; in other words, demonstrate the purpose of the original union of the companies, the persistence of that purpose and the extension of its dominion having the evil consequences depicted by the Government. Upon these instances it would seem unnecessary to dwell, the companies not being competitive at the time of their union in the United Company. However, they are made so much of by the Government and are so strongly urged that attention must be given to them. The most important of them and the one that was given most prominence in the testimony was that of the plant and machinery of the Thomas G. Plant Company, a New Jersey corporation, a manufacturer of shoes, not of machinery, and of the shoe machinery interest of Thomas G. Plant.

Plant was an inventor of machines of the shoe-bottoming variety and had taken out a number of letters patent in the United States and foreign countries covering the same. There was in the testimony and is in the argument of counsel dispute as to the efficiency of the machines of themselves. We say "of themselves" to distinguish

them from the inventions embodied in them, a necessary distinction to meet some of the phases of the case. A set was installed in the Plant Company's factory, of which Plant owned a majority of the stock. Two other concerns to which they were offered under inducements refused to accept them. It may be admitted, as the trial court found, that they had experimental promise, and it was testified that a number of shoe manufacturers had concerted to buy them. There were charges of infringements of the United Company's machines and Plant was loath to permit an inspection; indeed for a time refused it. And, besides, for their completion into a set for combined operation important machines were necessary which were not yet developed. As they stood they were undoubtedly inferior to the machines of the United Company, and in the state, therefore, in which the United Company took them they were not found capable of use. Nothing was in them which affords reasonable support for the Government's contention that they were "right at the threshold of extensive competition with the United Company." But, suppose they were. It would only be conjecture to say that they would cross it or that their strength would be formidable if they did. It is in the testimony that they broke down upon trial and were supplanted in the Plant factory where Plant had installed them by the United Company's machines. And the substitution was not at the dictation of the latter company. The vice president of the Plant Company and the general manager of its factory testified that satisfactory work could not be done with them on men's shoes; they broke down even in the manufacture of women's shoes to which they were adapted.

It appeared that some of the machines infringed the United Company's and in some details the latter infringed the Plant machines, and the complexity of rights hence resulting, to which we shall presently refer, had led to and threatened litigation; to compose which, it was

testified, and the trial court found, was a contributory inducement of the United Company's purchase from Plant.

The Government resists the finding. Its conception is, and to this all of its contentions are addressed, that the United Company combined and was intended to combine great competing companies and to acquire other competing companies. "The United Company acquired," counsel say, "every company then [when the company was organized] actively putting out or planning to put out" machinery adapted to bottoming shoes, and that "in the twelve years before the bringing of this action no substantial change took place, but rather the monopoly so acquired was in some respects extended and in many respects strengthened and intrenched." In the light of this conception and contention the Government sees and colors all that the United Company has done, all of the acquisitions it has made, and upon whatever motive made, including the prevention of patent troubles or the composition of litigation. And it directly says of the purchase from Plant that it was made at an overvaluation and by it Plant was tempted to the bargain and the United Company satisfied by getting rid of a competitor.

We get no solution of the purpose of the parties by the price the United Company paid.[1] We must consider what it was paid for. It is to be remembered that we are dealing with a transaction which took place eleven years after the formation of that company and is to be judged of by its own circumstances, the incentives of that time. Plant was eager to sell and the overtures came from him— indeed, he engaged two intermediaries, to one of whom he paid a large commission. There was necessarily negotiation before the final meeting of minds. To estimate the bargain to it the United Company insisted upon an

---

[1] The price was $3,000,000 in cash and $1,500,000 in common stock of the United Company at par, the market value of which was $3,000,000.

inspection of the machines, that is, to estimate their value, as it was testified, "to. the advancing of the art of shoe-making." [1] Plant refused at first, as we have said, but later yielded, and after inspection the purchase was consummated. Indeed, there were two inspections. The report on the first was adverse to the purchase. Mr. Winslow, president of the United Company, took part in the second and we may quote his testimony, for it is the standpoint of that company we are now considering. His testimony, besides, had confirmation. He believed, he testified, that he had a broader knowledge of shoe machinery than any one else and he therefore studied the Plant machines "personally as an expert." He considered them, he said, from the standpoint of their capacity, the value of the inventions and the improvements embodied in them, the comparison of their work with the work of the United Company's machines and the mechanical construction of the latter. He further testified that "Plant had used the Goodyear machines [the United Company's machines] as a basis for his machines and had made important improvements and developments." He indicated one of the improvements in particular, which he regarded as of the very greatest practical importance, especially when combined

---

[1] Mr. Winslow gave the following explanation of his purpose in the Plant purchase as stated in conversations with Mr. Plant:

"I always declined to have anything to do not only with buying but considering his propositions without a full and complete right to examine his machinery, determine the value of the inventions—the patents that he had—and Mr. Plant knew that my position all the time, at every interview was that I was not interested in what it cost him to get them up, whether much or little. My entire and only interest was whether those patents could be made of benefit to our customers and the trade. If they could be of benefit, if they were of large benefit, and the trade ought to have them, I should be very glad to buy them and embody them in our machines for what I thought they were worth, irrespective of what they had cost him—but I would not pay a cent more for them."

with a device that the United Company had just developed and placed in its factories. In a "broad way," he said, the value was almost incalculable.

But there was an interdependency of values. While the Plant device had value over that of the United Company's, it was controlled by the latter, or, as the witness expressed the situation, "in a broad way it was a perfect deadlock." In other words, the United Company had the underlying invention and Plant a patent for a particular form of operation which was necessarily subordinate to the other—a situation familar in patent law and contests.

It will be seen, therefore, that there was no other way out of the deadlock, if the inventions were to be used together—that is, embodied in one machine, without infringement—than by ownership in one hand of all the patents. That plan was adopted and was the inducement of the purchase of the Plant inventions by the United Company. But there was litigation to be composed as well, and it was composed.

Another witness testified as to the relation of the Plant patents and those of the United Company and stated that the result, if Plant had insisted upon his patent rights and the company had insisted upon its patent rights, would have been "a stop in the development of shoe machinery in these lines." And continuing, he said: "We should hardly have dared to go ahead with the improvements in our machines for fear of not succeeding in our patent litigation, or of conflicting with such improvements as Plant had patented. On the other hand, Plant, or any company which he might form, would have hardly dared to go ahead with the possibility of these infringement suits. These infringement suits, or a good many of them, were then pending, and certainly he would have found very few customers, I think, for his machines."

This, in outline, was the situation that confronted the

parties and induced their transaction, the incentives of each being as indicated. And they were justifiable incentives, and we may accept them as an alternative to the contention made by the Government that a violation of law was the impelling motive of the parties. And we may say that after the United Company had made the Plant acquisition it proceeded to make improvements on the Plant patents and developed many of them, giving them an efficiency they did not have before.

There are other acquisitions that are emphasized, among them, that of the stock of the Goddu Sons Metal Company. It was acquired March, 1899, a month after the United Company was formed and eleven years before this suit was brought; and the inducement to the acquisition was to settle the patent troubles that came to the United Company through one of its constituent companies. The value obtained was in patents. These were for the metallic variety of machines, and, according to a witness for defendants, "at that time the United Company was putting out commercial machines for doing the work for which the Goddu Company machines were intended." And, according to another witness, though not then in a condition to be placed in the hands of manufacturers, "they were in a state of development where some of them could have been, without extensive changes, made operative."

By this testimony th defendants justify the purchase; the Government condemns it. The defendants say that it was in composition of an inherited litigation and that patents of value were obtained by it. To this the Government replies in condemnation that the cost of the settlement of the disputes was excessive, being $150,000, and the purpose of getting the patents was to forestall the competition they threatened and could have accomplished by their development.

The value of a settlement of a dispute about rights which has reached litigation or threatens it cannot be

easily or accurately estimated.   It depends upon too many considerations which are not reflected in the price paid. The other ground of condemnation has strength.   As the Government says, quoting Circuit Judge Putnam in another case, neither the letter of the law nor its purpose "distinguishes between strangling of commerce which has been born and preventing the birth of a commerce which does not exist."   But there is another view.   No one can tell the strength of the competition that may be in a patent.   It may be more than competition; it may be destruction, and the Anti-Trust Act surely does not require the acceptance of that or forbid effort to prevent it.   But even if such extreme does not impend, certainly improvement of business and its efficiency can be striven for without offense to the law.   *United States* v. *Winslow, supra.*

We may say here of the contention of the Government as to the acquisitions—and the same comment may be made of most of its contentions—that they cast us into speculation for their estimate and urge us to decide between well-sustained conflicting opinions and adjudge the defendants guilty of a violation of law.   And this, too, against the considered judgment of the trial court.

We see no illegality in the contract with Goddu for assignment of other inventions he might make, or in like agreement with others.   We content ourselves with this general declaration.   An analysis of the contracts is not feasible, nor are the covenants measurable.   That they are attempts to subject the inventive genius of the country to the designs of the defendants is too extreme.   They can be seen to have more particular use and to be justified in the circumstances of the transaction with which they were connected.   Those whom one employs one gives opportunity to (this was Goddu's case) and may exact that it be used for the employer.   Those who have conveyed to him special machines may be presumed to have been compensated by their price, and that in either case

there will be such development and use as to make them competitive is too speculative to justify a judgment.

It is to be noted that the acquisitions in this case were not coincident in time nor parts of the same transaction. They were scattered through a period of years and varied each from the other, had no dependency, were different and unrelated steps in the development of the business of defendants. They must hence be judged separately, not in accumulation.

The above comment is applicable to other acquisitions, said to be fifty-six in number. It is impossible to review them. A description of them and wherein the machines acquired were competitive with the machines of the United Company the Government sets forth in many pages of its brief, and the defendants reply as circumstantially with opposing delineation and justification. Their effect is hard to estimate. The removal in some degree of competition may be charged against some of them and yet, on the other hand, the acquisitions may be said to be justified by the exigencies or conveniences of the situation. Some of them were merely of accessorial machines; some in composition of patent troubles; some not connected with the special charge of monopoly to which the Government has limited itself; some the transfer to defendants of kinds of machines not possessed by them; some of patented improvements and inventions, aiding or completing the defendants' machines, tributary therefore to their efficiency. They give a false impression by their number. They added nothing of obnoxious power to the United Company nor in any practical or large sense removed competition.

Defendants charge that the Government not only puts an exaggerated computation upon the acquisitions by defendants but gives no credit for or account to their resistance of applications to buy other and, it is asserted, more important concerns. Their number is given as 75, all of great use and importance. The trial court found that the

offers refused were more numerous and several of them
were of concerns more important to the scheme of monop-
oly charged against defendants than any of the specified
acquisitions. The comment is justified by the evidence.

We pass by the charge of the Government that the
United Company through its president threatened destruc-
tion to opponents and the use of his influence in the busi-
ness world to enforce transfers of competing concerns and
the patents they controlled. The charge and its denial or
explanation were estimated by the trial judges and the
charge was held not to be established, or of no serious
importance. The court said that if the declarations could
be called "threats" in view of all the surrounding circum-
stances shown, it was not established that any competitor
lost a customer or that anybody was prevented from at-
tempting competition. Besides, they were isolated in-
stances, separated in time, without relation, not coördi-
nated acts in a scheme of oppression.

We cannot go into further detail without unduly ex-
tending this opinion. It would be repetition, besides, of
what was done carefully and thoroughly in the opinions of
the trial judges. We sum up with a generalization that
the United Company took by its organization "established
businesses already of great value, possessing great possi-
bilities of development," as said by the trial court. It was
discerned that there was advantage in their concentration,
and the expansion that has hence resulted has been as
much in necessary evolution as by design. At its founda-
tion there were certain basic patents and many auxiliary
ones. Inventors—those connected with and those inde-
pendent of it—were devising and experimenting, and of
this the company had to keep informed. It had to keep
up with the mechanical march; to fall back would have
been its destruction. There was growth not only in its
business proper but in the accessories to it. When it was
formed in 1899 it had no facilities for furnishing findings

and supplies. It was business enterprise or, it may be, necessity, to acquire them, and their acquisition became what is called in the case the United Company's "general department," which handles, it is said, between 150 and 200 different kinds of machines. The expansion to this and in this was like the expansion of the department store—an accumulation not only of necessary things, but of incidental, supplemental things, auxiliary to the completion and finish of a boot or shoe. There is a service force as well, estimated at 6,000 men, to repair immediately breaks or deterioration without extra charge. And these men are kept at convenient places to repair machines and replace worn-out parts, and depots of supplies are maintained. There are also instructors of operators as well as furnishing of men in emergency. It is in the testimony that a total of 8,889 operatives were taught in the year 1911 alone.

The company, indeed, has magnitude, but it is at once the result and cause of efficiency, and the charge that it has been oppressively used is not sustained. Patrons are given the benefits of the improvements made by the company and new machines are substituted for the old ones without disproportionate charge. There has been saving as well in the cost of manufacture of shoes. These are some of the results of the organization of the United Company. Others are testified to and the means of their accomplishment; but time will not permit their statement, and we pass to the leases.

There was complaint of them and the Government attacks them. Complaints, however, may be interested lament; but, on the other hand, they may be the expression of real grievance and demand redress. And which they are should be considered. To the attacks of the Government the defendants reply that the leases are the exercise of their right as patentees and if there is monopoly in them it is the monopoly of the right. It

must, indeed, be said that it is the experience of the world that the utility of an invention entices to its infringement; but it would be a perversion of things to facilitate the wrong by a sacrifice of the right in revulsion from the restraint which the right authorizes. But, on the other hand, we must not over-estimate the right or give it a sinister effect—permit it to be a means, to use the words of the Government, "to the building up and intrenchment" of an "illegal monopoly." We cannot consider the contentions with the detail that counsel have. We think that their answer is in the statement of certain general propositions.

Of course, there is restraint in a patent. Its strength is in the restraint, the right to exclude others from the use of the invention, absolutely or on the terms the patentee chooses to impose. This strength is the compensation which the law grants for the exercise of invention. Its exertion within the field covered by the patent law is not an offense against the Anti-Trust Act. In other circumstances it may be, as in *Standard Sanitary Mfg. Co.* v. *United States*, 226 U. S. 20, to which case that at bar has no resemblance.

The question, then, is, Was the patent right lawfully exerted in the leases? Were they anything more than the exercise of the patent monopoly? The word is descriptive and must be used, but it does not imply oppression. The old instrumentalities exist for all who are content with them and who care not for the better ones which inventive genius creates.

The charge of oppression puts out of view many essential things. We must keep in mind the quality of the right we are considering and that the inventor gets nothing from the law that he did not have before and that the only effect of his patent is to restrain others from dealing with or using its device. *United States* v. *Bell Telephone Co.*, 167 U. S. 224, 239; *Paper Bag Patent Case,*

210 U. S. 405, 424; *Motion Picture Co.* v. *Universal Film Co.*, 243 U. S. 502, 510. Or to put it another way, the inventor does not get from the law a right to a use that he did not have before but he gets the right to an *exclusive* use. Take this from him and you take all that the law gives him and to secure which the public faith is pledged. Chief Justice Marshall in *Grant* v. *Raymond*, 6 Pet. 218, 242.

Indeed, we said in the *Paper Bag Patent Case* that he may keep his invention out of use. Therefore, he necessarily has the power of granting it to some and withholding it from others, a right of selection of persons and terms. There is, however, a limitation upon him; he cannot grant the title and retain the incidents of it. *Straus* v. *Victor Talking Machine Co.*, 243 U. S. 490; *Bauer* v. *O'Donnell*, 229 U. S. 1; *Motion Picture Co.* v. *Universal Film Co.*, *supra.*

These cases have received review and application in *Boston Store of Chicago* v. *American Graphophone Co.*, 246 U. S. 8. The principle of them was expressed to be that where an article has been sold it passes beyond the monopoly given by the patent and conditions cannot be imposed upon it. Leases are not of this character; they do not convey the title. It is not contended, nor could it be, that in this case they are a disguise for something else, artifices to convey the machinery and yet keep it subject to the patent right and its exercise. It therefore follows that conditions may be imposed by them.

It is not certain that the Government denies this or means to assert anything more than that the patent right is exercised in oppression, assisting, indeed consummating, a scheme of monopoly, begun by the formation of the United Company, prosecuted in the various ways to which we have referred, and completed by the leases and their clauses.

It is difficult to represent the contentions of the Gov-

ernment without under-coloring them or over-coloring them. There is one that the leases are invalid in and of themselves; there is another that "ultimately, of course, it is upon the lease forms themselves and their apparent and necessary effect upon competition that the United States relies." The first contention the Government leaves very much to assertion, and defendants charge that it was not made in the trial court; the second contention is necessary to assign to the leases an obnoxious quality in the hands of the United Company which they did not have in the hands of the constituent companies. The distinction would seem to be not material of itself, and the important consideration is not what the leases were in some other relation but what they are in their present relation and to what purpose are they being rightfully or wrongfully, or can they be rightfully or wrongfully, used or enforced? To this inquiry we shall now address ourselves.

The first objection made to the leases is that they are unchangeable by the lessee—he "has no right," it is urged, to demand either the cancellation or modification of an existing one. The objection is not definite or measurable. It is probably but a representation of what is deemed the severity of the leases, for, of course, a contract is a restraint upon option and can be enforced. This power is its efficacy and indicates its obligation. And further it is of no consequence that the leases cover all of the machines of the United Company if they are an exercise of the patent rights. Whether they are is the broad question in the case and its disposition will dispose of all minor and dependent ones.

What, then, do the leases accomplish? They have clauses called "tying" clauses, so called because, it is said, they tie the use of the machine leased to the use of machines not covered by the particular lease. Their result is, the Government asserts, "to make it in effect a

condition of the lease that the lessee shall not use the machines of competitors either to supply a need for additional machines of the kind leased or for machines of other important though wholly different types."

And it is urged: "In addition to those clauses there are certain other clauses which have a similar effect upon the freedom of the lessee's choice of machines. They give to the tying clauses their maximum effect as destroyers of the possibility of competition with the defendants." It is charged that "the objectionable clauses are inter-related and operate together with cumulative effect"; that "they are unlawful both as integral and effective parts of an unlawful whole, and, for the most part, in and of themselves." And it is further charged that "it is, however, in their combined effect as a system of leasing, used and insisted upon by a corporation dominant in its field that the full extent of their illegality is to be perceived." This, however, is assertion and relies for its foundation upon the assumption of an illegal dominance by the United Company that has been found not to exist. This element, therefore, must be put to one side and the leases regarded in and of themselves and by the incentives that induced their execution; and to a suit seeking their dissolution it may well be contended that the lessees are necessary parties, certainly so far as existing leases are concerned. But the contention of the Government goes farther and asserts that its purpose and object justify the absence of the lessees from the case. Indeed the Government takes merit to itself in relieving them of a thraldom. "The rights of the lessees," it is said, "are not touched except to preserve them." But a lessee may like his situation, may have deliberately chosen it and may not care for any interposition, benevolent or otherwise.

Finally the Government, in possible opposition to both lessor and lessee, asserts that "no one has the right to

say that the unlawful conduct of another shall be permitted to continue because he has an interest in it." Perhaps not. But there may be dispute as to the character of the conduct, and its illegality cannot be conceded to mere assertion and the consequent assumption of a destroying power.

However, let us consider the clauses from the standpoint of the Government's contentions and determine if they transcend the rights given to patentees. The clauses are: (1) One that prescribes a uniform term of 17 years. The result of this is, the Government says, "that during that long period no replacement of a machine so leased by a better machine of defendants or others and no change in the form of the lease, or avoidance of any of its requirements is open to the lessee except with the defendants' consent and upon their terms." To this it is replied that the leases of the constituent companies ran for indefinite periods and, besides, new patents were constantly taken out, and to these the criticism of the Government does not apply. And again, the term was assurance to the lessee as well as lessor, and, as defendants' counsel suggest, there is analogy in the term to that of a building lease which may under the hazard of circumstances turn out to be or not to be advantageous Of this there are two recent examples in this court. *Filene's Sons Co.* v. *Weed,* 245 U. S. 597, and *Gardiner* v. *Butler & Co.,* 245 U. S. 603. Indeed, we may say of all the clauses, without a minute analysis and discussion of them, that they were simply bargains, based on patent rights and the conditions upon which those rights were granted.

(2) The "additional-machines" clause, which provides that in case the lessee has more work than can be performed by the machine leased, he will lease additional machinery to perform the work and that if the lessee does not do so the lessor may cancel the lease if he so elect, and any other lease of machinery of the same kind then in

force between them. This clause, we shall presently see, was discontinued in 1907 and was not in use when this suit was brought. ·(3) An "exclusive use" clause requiring the lessee of particular machinery to use it exclusively and the auxiliary machines which aid or supplement it, and for failure to do so, lessor may at his option terminate forthwith in writing any or all leases or licenses of the particular machines and accessorial machines and they shall become revested in the lessor. This clause only requires an election of use between the United Company's machines and those of other makers. If the election be of the latter, the lessor may terminate the lease and resume his machines. ·(4) A prohibitive clause. This clause provides that the particular machine leased shall not be used in the preparation or manufacture of shoes, etc., upon which work is done by any machine not held by the lessee under lease from the lessor. (5) The right to terminate all leases clause. This clause does not need much explanation. Its name expresses its purpose. It gives the lessor the right, in default of the performance of the conditions of the particular lease, not only to cancel that lease but all other leases and requires a delivery of the leased machinery to the lessor at Beverly, Mass., complete and in good order, reasonable wear and tear alone excepted. ·(6) The full-capacity clause. Its name expresses its purpose. It requires the leased machinery to be used to its full capacity upon the work to which it is applicable. This clause was in the lease of the Consolidated Company prior to the formation of the United Company. Its purpose is to secure the royalty which is based on the amount of use of the machine. It does not require the use of any particular machine or the use of other machines. It merely requires that the particular machine that is installed shall be used if the lessee have work for it. Without it defendants say that, as lessors, they would have no assurance of compensation for their machine. (7) A

charge upon the return of the machinery leased is required. This needs no comment or further notice. (8) The leases of metallic machinery provide for the purchase from the lessor of certain fastening material. This clause and the next, which provides for the payment of royalties, are mere make-weights and not of special materiality.

The evil potency ascribed to the leases (we use the word as inclusive of the clauses and we do not think it necessary to distinguish them according to their application to particular machines) by the Government is their asserted coercion of shoe makers and machinery makers. They limit the freedom of the first, it is contended, and by that limitation preclude the competition of the second with the defendants. In other words, the use of the machines of the United Company is compelled as against the use of machines of other manufacturers, resulting in the restraint of the trade of the latter. To this charge all other charges are subsidiary, and the restraint is said to have been the initial conception of the company and the purpose of its organization. The evidence disproves this. As we have seen, the leasing of their respective machines was the practice of the constituent companies before their union and they were substantially the same after union as before—in instances better. There was a difference as to the prohibitive clause. After the union it related to machines of all of the companies. And the testimony also shows that the advantage of the leases was and is that manufacturers of not large means were able to obtain machinery which they were without capital to buy. They helped, indeed, the big and the little. One manufacturer, whose output was 5,000 pairs of shoes a day, testified that if his company had been compelled to buy outright the machinery necessary to equip its factory, it could not have developed as it had.

And sets of machines are necessary to the equipment of a factory, and their best results are obtained when used in proper relation. This relation, indeed, the necessary coördination of the machines, was shown pictorially by a number of views in the court below, as well as testified to by witnesses. And there is great economic advantage, it was testified, in the accessory service furnished by the United Company for the reason that "the regularity and continuous operation of the machines is dependent upon what may be termed instantaneous service. . . . This factor of service is at the very base of the successful operation of a shoe factory. The work is planned to travel from one room to another in fixed quantities. So many pair go in in the morning—so many pair come out at night. The operatives are dependent upon that work traveling along regularly to them. The breaking down of some of these machines will in many of the factories block the entire flow of the work." This was the testimony of the president of the United Company, and it received corroboration from a witness for the United States, who said: "The margin of profit in making shoes is such that it is very essential that our machinery should work smoothly and regularly and with continuity, and economies in the manufacture of shoes often make the difference between a successful manufacturer and one who is not successful. One of the most important economies is to have our machinery work with continuity and with the highest efficiency and turn out our product with the utmost regularity day after day, just as we want to get it so that there won't be any hitch anywhere in the flow of our product through our factory." The witness gave praise to the excellence of the machines of the United Company. This excellence and the described service the leases secured to the lessees and secured at the same time rights to the lessors. And the leases are strictly a reservation of the use of the machines, a right

recognized in *Bauer* v. *O'Donnell; Straus* v. *Victor Talking Machine Co.*, and *Motion Picture Co.* v. *Universal Film Co., supra.* We must assume they were entered into by the lessees upon a calculation of their value—the efficiency of the machines balanced against the restrictions upon and conditions of their use. The lessees had the alternative of the choice of other machines for other machines were sold side by side with those the leases covered. This, we think, is put out of view.

Let us guard against confusion and not confound things which must be kept in distinction. A patentee is given rights to his device, but he is given no power to force it on the world. If the world buy it or use it the world will do so upon a voluntary judgment of its utility, demonstrated, it may be, at great cost to the patentee. If its price be too high, whether in dollars or conditions, the world will refuse it; if it be worth the price, whether of dollars or conditions, the world will seek it. To say that the world is not recompensed for the price it pays is to attack the policy of the law, is to defy experience and to declare that the objects of inventive genius all around us have contributed nothing to the advancement of mankind. This comment is applicable here. We cannot accept, therefore, the contention of the Government. We see nothing else in the circumstances of the parties than that which moves and may move the transactions of men.

We may say further, in answer to the criticism of the leases, that relaxations of them were granted by "riders" and that forms other than the restrictive were open to the shoe manufacturers, distinguished in the testimony by the term "independent." They do not contain the prohibitive clause but do contain the other clauses and require an initial payment. Comparison is made of the independent form and the other forms by witnesses and various judgments are expressed. The Government sees nothing in any of them but the restraints upon the freedom

of business, and regards the independent form as only slightly relaxing what counsel implies is the slavery of the others. The defendants contend that they are the simple exercise of a property right, the mutuality of agreement based on definite and valuable considerations. And it was testified that the machines in the United Company's general department have always been open to sale or lease. It is further said that the additional-machine clauses were removed from all leases of the company as early as 1907 and they were not in use and did not represent its policy at the time of bringing this suit. But leases with that clause are outstanding, the Government replies.

However, we need not dwell further upon the leases. It approaches declamation to say that the lessees were coerced to their making. And, as we have said, there was benefit to the lessee. It is easy to say that the leases are against the policy of the law. But when one tries to be definite one comes back to the rights and obligations of the parties. There is no question in the case of the use of circumstances to compel or restrain; the leases are simply bargains, not different from others, moved upon calculated considerations, and, whether provident or improvident, are entitled nevertheless to the sanctions of the law. We have said this, indeed, with iteration, but sometimes propositions which have become postulates have to be justified to meet objections, which, if they do not deny their existence, tend to bring them into question.

Besides, it is impossible to believe, and the court below refused to find, that the great business of the United Shoe Machinery Company has been built up by the coercion of its customers and that its machinery has been installed in most of the large factories of the country by the exercise of power, even that of patents. The installations could have had no other incentive than the excellence of the machines and the advantage of their use, the con-

ditions imposed having adequate compensation and not being offensive to the letter or the policy of the law.

*Decree affirmed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BRANDEIS took no part in the consideration and decision of the case.

MR. JUSTICE DAY, dissenting.

I concur with the opinion of MR. JUSTICE CLARKE [*post*, 75] as to the character of the combination here involved.

There are provisions in the so-called leases attacked in this case which in my view are so clearly within the condemnation of the Sherman Anti-Trust Act, that the further enforcement of them and the making of new leases of like character, should be enjoined. The far-reaching character of a decision sustaining a leasing system such as the defendant has developed and uses justifies a statement of the reasons which impel me to this conclusion.

As to the suggestion that the lessees are not parties to this proceeding, and, therefore, no decree can be had as to them, it seems to me this is not a case of want of indispensable or even necessary parties because of their interest such as should prevent the court from proceeding to a decree to enjoin the United Shoe Machinery Company from the further enforcement of these features of the leases and the making of similar contracts hereafter. If these leases are in violation of the Sherman Anti-Trust Act the makers of them may be proceeded against, and a decree rendered which shall effectually preclude them from further contracts of this sort, without the presence of the lessees, if it could be assumed that any of them should desire to be heard in advocacy of the retention of these prohibitive and restrictive features.

The object of this proceeding is to enjoin in equity fur-

ther violation of a criminal statute, not to determine title or property rights of the defendant. It is sufficient as to the doctrine of indispensable parties to refer to *Shields* v. *Barrow*, 17 How. 130, and the cases collected in the discussion of the subject in *Waterman* v. *Canal-Louisiana Bank Co.*, 215 U. S. 33, 48. There is no reason in this case why the court may not so shape its relief as to reserve the rights of persons not before it, if that should be necessary.

The questions involved in the aspect of the case now under consideration are two-fold. First: Are certain provisions of these lease agreements of themselves considered within the terms of the Sherman Anti-Trust Act? Second: Are such agreements to be held immune from the requirements of the act because of the fact that much, perhaps all, of the machinery of the United Shoe Machinery Company is made and leased under letters patent issued by the United States? Of these questions in their order.

1. It clearly appears from the record that the United Shoe Machinery Company dominates the trade in certain kinds of shoe machinery furnished to manufacturers all over the country; which machinery is essential to the successful prosecution of the business of manufacturing shoes. It has many customers to whom it supplies these machines under leases, and such customers are required to accept the terms of these instruments or go without the machines. The leases are made for a uniform term of seventeen years, and not now considering the conditions of payment for the use of the machines and other terms usual and legal in their nature, they contain certain other features which may be summarized in the requirements: (1) The lessee shall not use the machinery, or any part thereof, in the manufacture or preparation of welted boots, shoes or other footwear which has not had certain operations performed upon it by other machines leased from the lessor. This is called the prohibitive clause. (2)

UNITED STATES v. UNITED SHOE MACH. CO. 69

If at any time the lessee shall fail or cease to use exclusively lasting machinery held by him under lease from the lessor, or fail or cease to use exclusively tacking mechanisms and appliances held by him under lease from the lessor, etc., the lessor may at its option terminate any or all leases or licenses of lasting machines, etc., then existing between the lessor and the lessee, and the right of possession shall thereupon vest in the lessor. This is called the exclusive use clause. (3) In case the lessee has work of the kind which can be performed by the machines belonging to the metallic department of the lessor in excess of the capacity of the metallic machinery which he has under lease from the lessor, then the lessee shall either take from the lessor sufficient additional machinery to perform the work, or failing so to do the lessor may cancel the lease forthwith, or any other lease of metallic machinery then in force between the parties. This is called the additional machines clause. (4) The lessee shall obtain from the lessor exclusively, at such prices as it may establish, all the fastening material needed in operating the leased machines. (6) The lessee shall, at the election of the lessor, suffer a termination of all leases which he may have, and the removal of all machines leased by him from the defendant, in the event of any violation of any term of any one of the leases.

From familiar decisions of this court it may be said to be now well settled that the Sherman Anti-Trust Act condemns all combinations and contracts the effect of which is to unduly restrain the free and natural flow of interstate commerce, or which monopolize or tend to monopolize such trade or commerce in whole or in part. While the act does not reach normal contracts sanctioned by law and sustained by usage, it does reach any and all means and devices by which the purposes of the act to protect the freedom of interstate commerce may be thwarted and monopolies promoted and created. *United States* v. *Ameri-*

*can Tobacco Co.*, 221 U. S. 106, 179; *United States v. St. Louis Terminal*, 224 U. S. 383; *United States v. Reading Co.*, 226 U. S. 324; *United States v. Patten*, 226 U. S. 525; *Eastern States Retail Lumber Dealers' Assn. v. United States*, 234 U. S. 600. That these lease restrictions tend to prevent the free flow of interstate commerce, and the natural course of its activities, and at least tend to monopolize an important trade in interstate commerce seems apparent from a mere statement of their terms, having in mind their natural and necessary effect.

For the seventeen years term for which all the leases are drawn, the lessees upon failure to use exclusively the defendant's machines for lasting shoes, or upon failure to purchase needed additional machines from the lessor, or to buy certain supplies from the lessor at prices to be fixed by it, are subject to the right of the lessor to terminate all the leases held by the offending lessee and to take possession of the machines to the utter destruction of the lessee's business. The necessary effect of these prohibitive provisions, in view of the dominating control of the business by the lessor, is to prevent the lessee from using other similar machines, however advantageous to him it may be to do so, unless he is willing to incur the peril of losing machinery essential to his business. It likewise so curtails the field of free customers as to keep others from manufacturing such machinery.[1] Whenever a new ma-

---

[1] The Judiciary Committee of the House of Representatives, when considering the Clayton Bill (38 Stat. 730), said of such provisions:

"Where the concern making these contracts is already great and powerful, such as the United Shoe Machinery Company, . . . the exclusive or 'tying' contract made with local dealers becomes one of the greatest agencies and instrumentalities of monopoly ever devised by the brain of man. It completely shuts out competitors not only from trade in which they are already engaged but from the opportunities to build up trade in any community where these great and powerful conditions are appearing under this system and practice. By this method and practice the Shoe Machinery Company has built up

chine is acquired by the lessee for the period of seventeen years (the full life of a patent under the statutes of the United States) the chain is forged anew which binds him to the use of the lessor's machines, to the practical exclusion of all others.

Nor is the situation changed by the fact that so-called independent leases are offered to manufacturers.  These leases require the payment of considerable additional charges and embrace terms which lead the shoe manufacturers to choose the prohibitive and restrictive forms of leases rather than to accept others.  Moreover, the questions in this case are to be tried upon the effect of the leases actually made, and for years to remain in force. When it is considered that these results may be obtained in the conduct of a great business industry by this system of "tying" contracts, the necessary effect to restrain the freedom of commerce, and the attempt to effect monopolization, seem to me to be established.

2.  The stress of the argument on behalf of the company is rested upon the fact that it is the owner of letters patent issued by the United States, and that within the monopoly created by such patents it has the right to make and enforce such contracts as are herein involved.  At an

---

a monopoly that owns and controls the entire machinery now being used by all great manufacturing houses of the United States.  No independent manufacturer of shoe machines has the slightest opportunity to build up any considerable trade in this country while this condition obtains.  If the manufacturer who is using machines of the Shoe Machinery Company were to purchase and place a machine manufactured by an independent company in his establishment, the Shoe Machinery Company could, under its contracts, withdraw all their machinery from the establishment and thereby wreck the business of the manufacturer."  (Report of Committee, p. 13.)

A statute of Massachusetts forbidding patentees from making leases in effect like those here involved was sustained as constitutional by the Supreme Judicial Court of Massachusetts in 193 Massachusetts, 605.

early day this court, speaking by its Chief Justice, declared: "The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent." *Bloomer* v. *McQuewan*, 14 How. 539. The extent and nature of rights secured by letters patent have been the subject of recent consideration in this court, and the definition, just quoted, has been approved and applied. *Bauer* v. *O'Donnell*, 229 U. S. 1; *Straus* v. *Victor Talking Machine Co.*, 243 U. S. 490; *Motion Picture Co.* v. *Universal Film Co.*, 243 U. S. 502; *Boston Store of Chicago* v. *American Graphophone Co.*, 246 U. S. 8.

When this case was tried in the District Court *Henry* v. *Dick*, 224 U. S. 1, was the law of this court. In that case a mimeograph, made under letters patent, was sold for less than its full value, with a license agreement limiting its use to certain unpatented articles belonging to the patentee. Such use was held to be within the exclusive right secured by the lessor's patent. In *Motion Picture Co.* v. *Universal Film Co., supra*, it was sought to extend the doctrine of that case so as to protect a license agreement evidenced by notice attached to the machine so as to limit the purchaser to the use of certain films, and to restrict the purchaser to other terms to be fixed by the owner of the patent at his discretion. But such extended scope of patent rights was denied and it was again held that the patentee received from the law no more than the exclusive right to make, use, and sell his invention.

It is said, however, that the series of cases begining with *Bauer* v. *O'Donnell, supra*, and ending with *Boston Store of Chicago* v. *American Graphophone Co., supra*, decided at this term, hold no more than that a patentee may not sell an article covered by his letters patent, receive his price therefor, and then undertake to impose a restriction upon the price at which resales of the patented article may

be made. A reading of those cases shows that the nature and extent of the right to grant to others the use of an invention was fully discussed, and its limitations defined.

In the *Motion Picture Case* the right of a patentee to place restrictions upon the use of a patented machine, and to limit its use by a purchaser, or purchaser's lessee, to terms stated in the license agreement, was considered. This court held that such limitations as were there involved upon the use of patented machines were not within the scope of the patent. It was upon the expanded right to use an invention that the *Button Fastener Case*, 77 Fed. Rep. 288, and *Henry* v. *Dick*, were rested; both cases were overruled in the *Motion Picture Case*. In the latter case it was specifically held that while the patentee might withhold his invention from public use, yet if he consented to its use by himself or others, he was limited to the use described in the claims of his patent, and that there was nothing in the statute which extended his right to control the patented invention by prescribing the use of machines, materials and supplies not covered by the patent. In view of the full discussion of the question in the series of cases already referred to, it is unnecessary to pursue it further.

Under the system of leasing, now before us, the patentee not only undertakes to grant the use of the machines covered by the letters patent, but to dictate the supplies with which they shall be used; to compel their surrender if the machine of another is used; to prevent their use except with other machinery furnished by the patentee; to extend the monopoly of the invention beyond the 17 years allowed by the statute; to lease the use of the invention only upon terms which permit the lessor to forfeit the patent license, and to terminate, if he chooses, all similar leases to use the machines of the lessor. And these extraordinary claims of right are made under the grant of the patent which gives to the inventor the exclusive

right to make, use, and sell his invention, and nothing more. In my opinion such extended power and authority are not consistent with the act as the same has been construed in every case dealing with the subject beginning with the decision in *Bauer* v. *O'Donnell*. To sustain such provisions it seems to me amounts to an authority to holders of patented inventions, under the guise of leasing the use of patented machinery, to exercise the right to make combinations necessarily and unduly restraining the freedom of trade, and by virtue of the patent grant to build up monopolies in direct violation of the Sherman Act.

True it is that there is embraced in the patent grant the right or privilege to make licenses and agreements covering the use of the machines patented so long as such agreements are not in themselves unlawful. But the right to make restrictions is controlled by the general principles of law, and because he is at liberty to make them, the patentee may not make contracts in themselves illegal and certainly is not authorized to make contracts in violation of other statutes of the United States. That rights granted under a patent do not authorize the making of contracts in restraint of trade, or monopolizing or tending to monopolize trade and commerce in violation of the Sherman Act, was held by this court in *Standard Sanitary Mfg. Co.* v. *United States*, 226 U. S. 20.

In *Straus* v. *American Publishers' Assn.*, 231 U. S. 222, contracts, otherwise clearly within the terms of the Sherman Act, were claimed to be justified because of rights secured under the copyright laws of the United States. Quoting and following the decision in the *Standard Sanitary Mfg. Co. Case*, this court said: "So, in the present case, it cannot be successfully contended that the monopoly of a copyright is in this respect any more extensive than that secured under the patent law. No more than the patent statute was the copyright act intended

to authorize agreements in unlawful restraint of trade and tending to monopoly, in violation of the specific terms of the Sherman Law, which is broadly designed to reach all combinations in unlawful restraint of trade and tending because of the agreements or combinations entered into to build up and perpetuate monopolies.  .  .  ."

The patent statute and the Sherman Act are each valid laws of the United States.  While a patentee should be protected in the exercise of rights secured to the inventor under the patent system enacted into the laws of the United States, there is nothing in the act which gives the patentee a license to violate other statutes of the United States, and certainly not the one now under consideration.  In my opinion the restrictive and prohibitive clauses of these leases are within the Sherman Act, as they are clearly in restraint of interstate trade and tend to monopolize in the sense that those terms have been defined in the decisions of this court.  That some of the leases were in existence when the United Shoe Machinery Company was formed affords no protection as against the exercise of the power of Congress in the passage of the Sherman Act.  *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467, 480.  I think that a decree should be entered as prayed for, and I therefore dissent from the opinion and judgment of the court.

MR. JUSTICE PITNEY and MR. JUSTICE CLARKE concur in this dissent.

MR. JUSTICE CLARKE, dissenting.

A plain history of just what the parties did at and after the time the United Shoe Machinery Company was organized in February, 1899, compiled, almost exclusively, from the testimony of the two leaders in the organization and from documentary evidence, will be the best state-

ment I can make of the reasons other than those stated in
the dissenting opinion by Mr. Justice Day, which render
it impossible for me to concur in the opinion and judg-
ment of the court in this case.

I fully agree with the customary practice of giving great
weight to the conclusions of trial judges as to questions
of fact involved when the value of the testimony depends
upon the appearance and manner of the witnesses when
testifying, but the reason for this rule ceases when the
evidence is in writing or consists, chiefly, as it does in this
case, of purchases of property, the significance of which
lies in the fact of the purchase rather than in the manner
of making it.

Obviously, the attaching of the sole of a shoe to the
upper is the difficult and dominating operation in the man-
ufacture of shoes by machinery, and early in the trial the
charge of the Government in the case, by stipulation in
open court, became, that the consolidation was formed
for the purpose of monopolizing interstate trade or com-
merce in machinery adapted to that purpose, the "bot-
toming of shoes," in violation of both the first and second
sections of the Anti-Trust Act of 1890.

Before the merger the Goodyear Shoe Machinery Com-
pany (hereinafter designated the Goodyear Company)
was engaged in manufacturing and leasing to shoe man-
ufacturers two principal and sixteen auxiliary machines,
the latter being used in preparing the materials for the
operation of the former. The two principal machines were
used for sewing the sole to the upper and were known as
the Goodye welt and turn shoe machine and the Good-
year outsole rapid lock stitch machine. With these ma-
chines, the Goodyear Welt, a popular and largely used
shoe, was manufactured. This company also man-
ufactured a specially designed lasting machine used in
making Goodyear Welt Shoes.

The Consolidated and McKay Lasting Machine Com-

pany (hereinafter designated as the Consolidated Com·
pany) was engaged in manufacturing and leasing lasting
machines of three types.

As the name of the one implies, and as otherwise ap-
pears in the record, each of these two companies had re-
sulted from prior consolidations of shoe machine man-
ufacturing companies and they were the largest organiza-
tions of their kind in the country.

The controlling spirit of the Consolidated Company
was S. W. Winslow, and of the Goodyear Company E. P.
Howe, who, the record shows, were keen and masterful
men, and they both testifiy that in July, 1898, they began
the negotiations looking to a uniting of the interests of the
two companies, which culminated in the organization of
the United Shoe Machinery Company in February, 1899.
A "harmonious arrangement" or "working agreement"
was at first proposed, but Howe, being a lawyer, would not
agree to this, "because," he says, "I had a sort of in-
definite idea that it might be deemed to be a combination
in restraint of trade. . . . I had an indefinite fear that
if the two companies remained separate but, for instance,
had a joint factory and joint branch offices, there might
be something in the way of restraint of trade. I insisted
for that reason that there should be a complete merger
and consolidation."

This idea that the "harmonious arrangement" was
unlawful was doubtless inspired in the mind of Howe by
the decision in the *Trans-Missouri Freight Assn. Case*, 166
U. S. 290, rendered in 1897, and he probably shared a
then not uncommon notion that the holding company and
the merger were devices lawfully available for evading
the congressional purpose expressed in the Anti-Trust Act.
But in the *Northern Securities Case*, 193 U. S. 197, this
court decided in 1904 that the holding company was a
futile device, and in the *American Tobacco Co. Case*, 221
U. S. 106, it was decided in 1911 that the merger was also

a mere "subterfuge of form" which the courts would not permit to shield those who violated the act.

Thus rejecting the "harmonious agreement" or "understanding" as unlawful, for the purpose of accomplishing the same end, in what they thought a not illegal way, the defendants resorted to the merger (later on, as we shall see, using also the holding company) and organized the United Shoe Machinery Company, under the laws of New Jersey, with a capital stock of $25,000,000.

The scope of the declaration of the purposes for which this corporation was formed, as stated in its articles of incorporation, is of much significance in determining what the real objective was at which the persons interested were aiming. It is therein declared that the company is formed not only "to manufacture, lease and sell shoe machinery," but also, "to manufacture . . . boots, shoes, and footwear and *all articles* . . . of every description that may be produced or manufactured, in whole or in part, from leather, rubber or any other materials or fabrics; . . . to purchase, lease or otherwise acquire . . . trade-marks, trade-names, . . . copyrights and patent rights, . . . and, with a view to the working and development of the same, to carry on any legal business whatsoever, whether manufacturing or otherwise, which the corporation may deem calculated, directly or indirectly, to accomplish these objects, or any of them. . . . To hold, purchase, or otherwise acquire . . . shares of the capital stock . . . of any other corporation or corporations; . . . to do all or any of the above things . . . in any part of the world."

As impressive proof of the objects of the incorporators, we print in the margin some extracts from the certificate of incorporation of the holding company, the "United Shoe Machinery Corporation," organized in 1905, by the

men controlling the United Shoe Machinery Company, of 1899.[1]

---

[1] The following are excerpts from the articles of incorporation of the "United Shoe Machinery Corporation," with a capital stock of $50,000,000.00, filed May 2nd, 1905:

"Third.  The objects for which the corporation is formed are:

"To manufacture, buy, sell, lease, operate and deal in and with all kinds of machinery, tools, and implements, and mechanical devices and contrivances of every name and nature whatsoever, and especially to manufacture, buy, sell, lease, operate and deal in and with all sorts of boot and shoe machinery, lasts, trees, forms, and every kind of mechanism, contrivance, implement, tool, material, or thing in any way whatsoever connected with, or useful in connection with the manufacture of boots, shoes and footwear, or the manufacture of leather and rubber goods, or goods made from materials and fabrics of any description whatsoever, or useful in connection with the manufacture or operation of any of the machinery, mechanical devices or contrivances hereinbefore mentioned; to produce, prepare and manufacture, buy, sell and deal in and with leather and rubber, and materials and fabrics of all sorts, and the raw materials from which said leather, rubber materials or fabrics are produced; to manufacture, buy, sell and deal in and with boots, shoes and footwear and all articles and things of every description that may be produced or manufactured, in whole or in part, from leather, rubber or any other materials or fabrics; and in general to produce, prepar , manufacture and deal in and with goods, wares, merchandise, property, materials and things of every class and description.

"To carry on the business of manufacturers of and dealers in all kinds of eyelets, hooks, buttons, studs, nails, wires, rivets, tacks, metallic and other plates, metallic, wood and other fastenings, laces, cloth, linen, tape and other fabrics, brushes, abrasive materials, cements, dressings, stains, blackings and other requisites for the improvement and treatment of boots and shoes, threads, elastic material, buttons and inner soles, and other articles or substances for protecting feet from damp or heat, and other articles or substances used in connection with the manufacture of boots and shoes, corsets, stationery, sails, tents, clothing and for analogous purposes, and to carry on the business of manufacturers of and dealers in all kinds of appliances, devices, findings, tools, mechanisms, accessories, processes and things which may be used or useful in connection with the manufacture or treatment of any of the above named articles or substances.  .  .  .

And now thus equipped with apparent legal authority, amply sufficient if successfully used, to restrain and monopolize among the several States the branch of trade and commerce involved, let us see what the defendants did.

First of all, $4,918,000 of the stock of the new company was exchanged for all of the capital stock of the Goodyear and International Goodyear Companies, and $4,432,000 of stock plus $432,000 in cash was exchanged for all of the capital stock of the Consolidated Company. By this merger, with fifteen millions of the capital stock

---

"To apply for, obtain, register, purchase, lease or otherwise acquire, and to hold, own, use, operate, introduce, sell, assign or otherwise dispose of any and all trade-marks, trade-names and distinctive marks, copyrights, patents and patent rights, and all inventions, improvements and processes used in connection with or secured under Letters Patent of the United States or elsewhere, or otherwise, and to use, exercise, develop, grant licenses, in respect of, or otherwise turn to account any such trade-marks, patents, licenses, concessions, processes and the like, or any such property, rights and information so acquired, and, with a view to the working and development of the same, to carry on any legal business whatsoever, whether manufacturing or otherwise, which the corporation may deem calculated, directly or indirectly, to accomplish these objects or any of them. . . .

"To purchase, acquire by subscription or otherwise, and to hold for investment or otherwise, use, sell assign, transfer, mortagage, pledge, or otherwise dispose of and to guarantee any shares of stock, bonds, securities, or other obligations of any other corporation or association carrying on any business which this corporation is authorized to carry on. . . .

"To enter into partnership or into any arrangement for sharing profits, union of interest, joint adventure or co-operation with any person, partnership, association or corporation carrying on or engaged in any business which this corporation is authorized to carry on or engage in. . . .

"To do all and everything necessary or convenient for the accomplishment of the purposes, objects and powers above-mentioned, or incidental thereto, and to conduct its business, or do anything which it is authorized to do, in every State and in the Territories and Colonies of the United States of America and in foreign countries . . ."

of the new company still available for other uses, the two largest manufacturers of lasting machines in the country were combined and Winslow testifies that, "After the formation of the United Company it was manufacturing *every single lasting machine* that was being put out in the United States except the Seaver machine; and in 1900 we acquired the Seaver Company."

Next, and immediately, although Winslow testifies that "no word had been spoken to either the McKay people or the Eppler people when the charter for the United Company was obtained," the Company purchased the entire capital stock of the McKay Shoe Machinery Company for five and one-half million dollars of stock of the United Company. This company, Winslow testifies, was engaged in manufacturing metallic fastening machines and heeling machines, "was doing a very large business," and through controlled subsidiaries was "putting out nearly all the metallic fastening machines and nearly all the heeling machines that were being made in the United States."

Thus, confessedly, by this union of these three companies there were consolidated substantially all of the manufacturers of lasting machines and of machines for attaching the soles of boots and shoes to uppers with metallic fastenings and with thread, and in addition to this the Davey Pegging Machine Company was owned by the Consolidated Company.

There yet remained only one strong competitor doing business in this country, the Eppler Welt Machine Company, with an international subsidiary. Besides the Eppler there was only one other welt machine company engaged in business, the Globe, an unimportant concern which, however, was acquired by the United Company a little later, in 1901.

Although Winslow and Howe could remember within a small fraction of a cent just what royalties were paid at any time for the use of their machines, neither of them

could remember what was paid for the Eppler stock, and both testified that the records of the company did not show the amount. But other testimony shows that payment for it, of between $350,000 and $400,000 in cash, was made within a few weeks after the organization of the United Company, and it was admitted, significantly, that no inventory was taken at the time of the purchase of either the McKay or Eppler stock.

That the Goodyear and Eppler machines were sharply competitive is shown by the testimony of both Winslow and Howe. Winslow testifies that just before the consolidation the Eppler Company was "manufacturing a welting machine, an outsole stitching machine and two auxiliary machines" and that the Goodyear Company was making "a welting machine, an outsole stitching machine and auxiliary machines that performed the same functions that the auxiliary machines of the Eppler Company did, and a number in addition." "Both machines," continues Winslow, "were being used in the manufacture of men's welt shoes," and "the two welting machines that were being specially pressed on the market at that time were the Goodyear machine and the Eppler machine." And Howe testifies, "Those two types of shoes were well known in the trade. There was the Goodyear welt, made by the Goodyear welt machines; the Eppler welt, which was a recognized class of shoe. We didn't know whether the manufacturers would prefer . . . Eppler welts or whether they would prefer Goodyear welts."

What these two dominating spirits of the enterprise thought of their work at the stage of its development which we have thus far described, is interesting and illuminating as to their purpose. Thus, Winslow:

"Immediately after the organization of the company our welting, outsole stitching and lasting machines were doing about all the welting, outsole stitching and lasting that was being done in the United States.

"Q.   And so with your heeling and metallic fastening machines?

"A.   Not so much the heeling."

And this from Howe, "When the United was formed I don't remember that any outside concerns were putting out lasting machines," and he elsewhere says, on cross-examination, that lasting machines of the Goodyear and Consolidated Companies overlapped in the work which was done with them and, if this was true, obviously they must have been competitors in the market.

To this must be added the statements made in circulars sent at this time to the smaller stockholders of the companies to induce them to join in the combination.  Thus, to stockholders of the Goodyear Company:  "The great advantages to be secured by the control in one corporation, both in the United States and in foreign countries, of the efficient types of shoe machinery, have been for several years recognized by the officers of the principal shoe-machinery companies.  For more than a year your directors and large shareholders have been in negotiation to accomplish this end.   After a thorough investigation of the financial condition and the business of the shoe-machinery companies named below, the organization of a corporation has been effected under the laws of the State of New Jersey, to be known as the United Shoe Machinery Company. . . .   The United Shoe Machinery Company has already contracted for more than a majority of the capital stock of [the companies named other than the Eppler Company and the Davey Pegging Machine Company] besides stocks in other shoe-machinery companies, letters patent and other property.

"The United Company will also from time to time acquire other shoe-machinery and properties, either by direct ownership or purchase of shares of their stock."

I cannot share in estimating this circular as simply a naïve expression of unusual business foresight.   It was a

confidential circular, boldly phrased, perhaps because its authors thought that their combination had been given a character of merger which could withstand Government attack, but which this court has since repeatedly held is a mere subterfuge of form. The circular is an accurate descripton of what had been accomplished and of what, as we shall see, the evidence in the record shows, was intended to be done in the future.

It would seem that men who were not bent upon complete monopoly and control would have been satisfied with the advantages which, we have thus seen, those in this enterprise clearly held over any competitors who might remain or who might appear in the future. But that the men connected with the United Company were not satisfied, and were determined to make their control as perfect and permanent as possible, is shown by their further conduct during the first year of the existence of that company, as follows:

Within a month of the organization of the United Company, on March 1, 1899, for the sum of $74,800 worth of its capital stock it purchased the control of the Goddu Company, which was manufacturing metallic fastening machines, which competed with those of the absorbed McKay Company, and the six inventors who owned the stock were bound by the contract of purchase to transfer to the United Company all inventions relating to shoe machinery, which they *jointly or severally might make or have any interest in for a period of ten years;* and they were also bound not to become interested "directly or indirectly" for a like term "in the business of making and selling any inventions or improvements relating in any way to shoe machinery," or relating in any way to the manufacture of boots and shoes or useful in connection therewith "without the consent in writing of the United Company."

On the 16th day of March, 1900, the Company purchased from Winkley and Phillips the exclusive license

to use the inventions and improvements in sole leveling machines, described in ten letters patent of the United States and in patents of Great Britain, France and Germany, and bound the inventors to communicate to the United Company all inventions "which they or either of them *shall hereafter make*" in sole leveling machines or sole pressing machines. Howe testifies that at the time of this purchase the United Company was making machines of the kind, but of a different type.

On August 26, 1899, for the sum of $72,000 the Company purchased the business of Timothy Bresnahan, together with the entire capital stock of the Boston Shoe Tool Company. It employed Bresnahan as manager for two years and bound him by contract not to thereafter engage in "the manufacture of heel trimming, edge trimming or edge setting machines and tools . . . or of any . . . machines, tools and products now [then] made by him or by said Boston Shoe Tool Company," and that he would not "directly or indirectly aid, assist or encourage *any competition* with said Boston Shoe Tool Company or its business," but would do "everything in his power to promote the interests of the United Shoe Machinery Company."

On October 11th of the same year, the Company purchased from one Brewer, for $250 and $5 royalty on each machine which should be manufactured, *his application for letters patent* for an improvement in heel breasting machines, the one machine he had manufactured and the tools with which he had made it, and it took an assignment from Brewer "of any and all inventions *he may hereafter make* relating to machines for breasting heels 'on the last.'"

The attempt made in argument to justify as familiar business practice such contracts as these, binding inventors from whom patents and other property were purchased to surrender to the United Company all of the

fruits of their inventive genius for many years after the purchase and often for many years after their employment had ceased, is disingenuous in the extreme. In a single, terse sentence this court has made conclusive answer to such contention, saying, "Even if separate elements of such a scheme are lawful, when they are bound together by a common intent as parts of an unlawful scheme to monopolize interstate commerce the plan may make the parts unlawful." *Swift & Co.* v. *United States*, 196 U. S. 375; *United States* v. *Reading Co.*, 226 U. S. 324.

On January 13, 1900, the Company purchased, for the sum of $38,000, the business and assets, including twenty United States and foreign patents and 138 lasting machines, of the Seaver Process Lasting Company. This was the only independent company putting lasting machines on the market after the combination was formed, and it removed the last vestige of competition in the lasting machine business.

These will suffice. They are typical of fifty-seven purchases proved to have been made by the United Company prior to the commencement of this suit; of shoe machinery manufacturing companies; of boot and shoe manufacturing companies; of patent rights or applications for such rights; and of the property and businesses of partnerships and corporations engaged in manufacturing appliances "calculated," in the language of the charter of the company, "directly or indirectly, to accomplish the objects, or any of them, of the corporation," and varying from sewing machine needles and awls, to tacking machines, to buttons, brushes and sandpaper. Brewer's $250 application for a patent was not too small to be overlooked, and we shall see a six million dollar purchase was not too great to be made in order to continue, to extend, and to make secure, the complete control over the business involved, which was first attained by the consolidation of the Goodyear and Consolidated Com-

panies and the purchase of the McKay and Eppler Companies in 1899.

The history of the first year of this company would not be complete without reference to the fact that the combinations and purchases made during that year resulted in collecting under one control many hundreds of patents covering every "shadow of a shade" of variation in the parts of the many machines used in the manufacture of shoes, and, it must be noticed, that in the month of December, 1900, the first of the forms of leases were developed and brought into use, which came to be known in the trade as "iron clad," and which have been discussed by Mr. Justice Day in a dissenting opinion in which I cordially concur.

The boot and shoe trade of the country was so restless under what was regarded and unhesitatingly denounced as a monopoly, strongly entrenched, that although the men engaged in that trade were now utterly dependent upon the United Company for the terms on which they might continue to do business, at least two groups of important manufacturers were formed before the commencement of this suit for the purpose of devising, if possible, some means of freeing themselves from conditions which they regarded, as the record abundantly shows, as oppressive and intolerable.

Under the spur of this incentive it came to pass that a large manufacturer of shoes, one Plant, of Boston, developed a line of shoe manufacturing machinery so complete in character that on May 1, 1910, he canceled the leases which he held on many machines owned by the United Company and removed them from his factory, and advertised his readiness to supply manufacturers with adequate, and what was termed, "wonder working shoe machinery."

By Winslow's own story, negotiations for the purchase of Plant's shoe machinery manufacturing business by the United Company were entered upon on June 16th,

within two months of the time that he removed their machines from his factory. These negotiations were interrupted on July 5th, and on the 28th of the same month four suits were commenced by the United Company against Plant, two more were commenced on August 11th, two more on August 13th, and two more on September 3rd. These suits were in part to recover royalties claimed for the use of the United machines before they were taken out of Plant's factory and the rest were to enjoin him from using his own machines, on the ground that they infringed patents of the United Company.

Whether as a result of this familiar resort to coercive measures need not be determined, but on September 22nd, at four o'clock in the morning, possibly to anticipate negotiations which were in progress for the purchase of Plant's property by a group of wealthy shoe manufacturers, the United Company purchased Plant's shoe machinery manufacturing business and patents, and also the control which he owned of the capital stock of a shoe manufacturing company. The United Company paid for these two properties six millions of dollars, plus $122,000 for the Stambon property, which Plant insisted must be purchased as a part of the transaction. This large sum of money, larger than was paid for either of the original constituent companies of the consolidation, was not divided in the contract of sale, but Winslow allots three and one-half millions to the purchase of the shoe manufacturing company stock and two and one-half millions to the purchase of the shoe machinery manufacturing company and patents. Even this division, it will be observed, allows two and one-half millions of dollars to be paid for the Plant machinery company property and patents, which it is now argued were of little value and at best were infringements of patents owned by the United Company. Mr. Winslow, however, thought better of them, for he says they were "almost invaluable" to his company.

32.                   CLARKE, J., dissenting.

It is impossible for me to understand how the transaction, thus described in Winslow's own words, can fail to convince any one who reads or hears the description, that the Plant Company was a formidable competitor, actual and potential, of the United Company, and that the great sum of money paid to control it was paid to stifle and restrict competition.   Standing alone it shows the defendant to be an unmistakable offender against the Anti-Trust Law, but when taken together with the origin of the company and with the history of the conduct of it, a small but typical part of which we have described, it seems to me a flagrant and an all but confessed offender against that law, as it has been repeatedly interpreted by this court, _United States_ v. _American Tobacco Co._, 221 U. S. 106, 179; _United States_ v. _Reading Co._, 226 U. S. 324; _United States_ v. _Patten,_ 226 U. S. 525; _Eastern States Retail Lumber Dealers' Assn._ v. _United States_, 234 U. S. 600, and against the policy of the law as expressed in the act of Congress.

I shall add only the convincing statement as to the complete ascendancy which the combination has attained over the important branch of the industry of the country selected for its control, which is shown in the following results tabulated in the brief of the Government from the testimony, and from which all elements seriously disputed by counsel for defendants have been excluded:

| Machines in use in this country. | Manf'd by defendants. | Manf'd by all others. |
|---|---|---|
| Lasting machines. . . . . . . . . . . . . | 7,496 | 7 |
| Standard screw machines. . . . . . | 409 | None. |
| Pegging machines. . . . . . . . . . . . | 146 | None. |
| Tacking machines. . . . . . . . . . . . | 3,488 | 6 |
| Welt sewing machines. . . . . . . . | 2,527 | 142 |
| Outsole stitching machines. . . . . | 2,676 | |
| Loose-nailing machines. . . . . . . | 1,835 | |
| Heeling machines. . . . . . . . . . . . | 2,019 | 17 |

Further details could not add to the effect of the large outline we have thus presented. This is not a case to be decided upon the detailed statements of individuals as to their intentions or upon refined distinctions as to the application of the patent law. The design was a large one, comprehensively conceived and boldly executed. The dominating spirits of the enterprise, with the advantage of knowing precisely what they wished to accomplish, rejected a "harmonious arrangement" of their interests as unlawful, but to accomplish the same end they adopted the scheme of merger, since condemned by this court as a mere "subterfuge of form."

The trade recognized the combination as a monopoly from the beginning, and for years struggled in vain to free itself by organizing competing interests; the Judiciary Committee of the House of Representatives, when the Clayton Bill was under consideration, reported as the result of its investigations that the company appeared to be "a monopoly that owns and controls the entire machinery now being used by all great manufacturing houses of the United States" and with a record before me such as in outline I have detailed, it is impossible for me to agree that this now securely entrenched monopoly is an innocent result of normal business development.

The difficulties of bringing the defendants within the restraints of the law, which are regarded by the court as all but insurmountable, seem unimpressive in the presence of the resolute manner with which this court dealt with difficulties quite as complex and interests vastly greater in the *Northern Securities, Standard Oil* [221 U. S. 1] and *American Tobacco Co. Cases, supra.* In the last named of these cases it was found unnecessary "in order to give effect to the requirements of the statute" to apply the remedy of restraining the movement of the products of the combination in interstate commerce, or that of appointing a receiver for the property of the offender, for

the simple declaration by the court of its readiness to resort to either or both of these effective remedies, if the conduct of the parties or the exigencies of the situation should require it, served in that case, as it would in this, to open the way for bringing the powerful interests involved into obedience to the law.

Convinced as I am, by a most careful study of this record, that the United Shoe Machinery Company is a combination in restraint of interstate trade and commerce; that it was designed to and actually does monopolize a large part of that trade and commerce, and that it therefore is a continuing violation of both §§ 1 and 2 of the Anti-Trust Act of July 2, 1890, I am obliged to dissent from the opinion and judgment of the court.

I am authorized to say that MR. JUSTICE DAY and MR. JUSTICE PITNEY concur in this dissent.