INTERNATIONAL ORGANIZATION, UNITED MINE WORKERS OF AMERICA, et al. v. RED JACKET CONSOL. COAL & COKE CO., and eleven other cases.

Circuit Court of Appeals, Fourth Circuit. April 18, 1927.

Nos. 2492–2503.

1. Monopolies ⬳12(1)—International Organization, United Mine Workers of America, is not of itself unlawful "conspiracy in restraint of interstate commerce" (Clayton Act, § 6 [Comp. St. § 8835f]).

The International Organization, United Mine Workers of America, is not of itself an unlawful conspiracy in restraint of interstate trade and commerce, in violation of Clayton Act, § 6 (Comp. St. § 8835f), merely because of its extent and purpose to embrace all mine workers of the continent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

2. Monopolies ⬳12(1)—Labor union, turning from legitimate objects and engaging in conspiracy in restraint of trade, is accountable as any other organization.

When a labor union, lawful in itself, turns aside from its normal and legitimate objects and purposes and engages in actual combination or conspiracy in restraint of trade, it is accountable therefor in the same manner as any other organization.

3. Monopolies ⬳24(2)—Evidence held to warrant finding that International Organization, United Mine Workers of America, and others had engaged in actual conspiracy to restrain interstate trade by interfering with business of nonunion mines (Sherman Act [Comp. St. § 8820 et seq.]).

In consolidated actions by operators of nonunion coal mines against the International Organization, United Mine Workers of America, and others, to restrain interference with complainants' businesses, evidence held to warrant finding that defendants had engaged in an actual combination in restraint of interstate trade, in violation of Sherman Act (Comp. St. § 8820 et seq.).

4. Appeal and error ⬳1009(4)—Findings of judge in equity case should not be disturbed unless clearly against weight of evidence.

In injunction suit, findings of trial judge should not be disturbed unless it clearly appears either that he has misapprehended the evidence or has gone beyond the clear weight thereof.

5. Monopolies ⬳13—Conspiracy to interfere with business of nonunion coal mines held conspiracy to interfere with interstate commerce (Sherman Act [Comp. St. § 8820 et seq.]).

Conspiracy of International Organization, United Mine Workers of America, and others, to interfere with the business of West Virginia nonunion coal mines producing more than 40,000,000 tons of coal per year, more than 90 per cent. of which was shipped in interstate commerce, held a conspiracy to restrain or interfere with interstate commerce, in violation of Sherman Act (Comp. St. § 8820 et seq.), particularly in view of purpose of defendants to stop shipments.

6. Monopolies ⬳12(1)—Conspiracy is violative of Sherman Act, where there is intent to restrain interstate trade and appropriate scheme, though it does not operate directly on instrumentalities of commerce (Comp. St. § 8820 et seq.).

A conspiracy is in violation of Sherman Act (Comp. St. § 8820 et seq.), where there exists an intent to restrain interstate trade and commerce and a scheme appropriate for that purpose, even though it does not act directly on the instrumentalities of commerce.

7. Monopolies ⬳12(1)—Intent to restrain interstate trade is presumed, where it is necessary result of things done or contemplated.

Where the necessary result of things done pursuant to or contemplated by a conspiracy is to restrain trade between the states, an intent to so restrain trade is presumed.

8. Monopolies ⬳24(2)—Coal mine operators held properly joined as plaintiffs in consolidated suits to enjoin labor union's interference with their business (Sherman Act [Comp. St. § 8820 et seq.]; Clayton Act, § 16 [Comp. St. § 8835o]; new equity rule 26).

Numerous nonunion coal mine operators in West Virginia held properly joined as parties plaintiff in consolidated suits against the International Organization, United Mine Workers of America, and others to enjoin interference with complainants' business as in violation of Sherman Act (Comp. St. § 8820 et seq.); in view of Clayton Act, § 16 (Comp. St. § 8835o), and new equity rule 26.

9. Equity ⬳51(1)—Separate claims of numerous persons against same defendant, arising from common cause involving same law may be determined in single action.

To prevent a multiplicity of suits, a court of equity will determine rights in a single suit by numerous persons having separate and individual claims against the same party, where such claims arising from some common cause are governed by the same legal rule and involve similar facts.

**10. Equity ⬤⇒149—Equity rule relating to uniting of causes of action held not inapplicable, where there is more than one plaintiff (new equity rule 26).**

New equity rule 26, providing that causes of action on behalf of more than one plaintiff must be joint, " * * * or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice," as to quoted language, is not applicable only to uniting of causes against defendants, but applies also to uniting of causes on behalf of several plaintiffs.

**11. Equity ⬤⇒370—Coal mine operators' suits to enjoin labor union's interference with business held properly consolidated (U. S. C. tit. 28, § 734 [Comp. St. § 1547]).**

Suits by owners and operators of nonunion coal mines to enjoin labor union's interference with their business *held* properly consolidated under Rev. St. § 921 (U. S. C. tit. 28, § 734 [Comp. St. § 1547]).

**12. Injunction ⬤⇒63—Injunction restraining labor unions from inciting, inducing, or persuading employees of nonunion coal mine operators to break employment contract held not too broad (Clayton Act, § 20 [Comp. St. § 1243d]).**

Decree restraining labor union and others "from inciting, inducing, or persuading the employees of plaintiffs [nonunion coal mine owners and operators] to break their contract of employment with the plaintiffs," *held* not objectionable; Clayton Act, § 20 (Comp. St. § 1243d), prohibiting injunction against peaceful persuasion being inapplicable.

**13. Injunction ⬤⇒101(2)—Statute prohibiting injunction against peaceful persuasion held inapplicable to action between employer and persons neither seeking employment nor ex-employees (Clayton Act, § 20 [Comp. St. § 1243d]).**

Clayton Act, § 20 (Comp. St. § 1243d), prohibiting injunction against peaceful persuasion, *held* inapplicable in case between employers and persons who were neither ex-employees nor seeking employment.

**14. Injunction ⬤⇒49—Decree enjoining labor unions aiding or abetting persons withholding employees' houses of nonunion coal mine operators held proper.**

Decree enjoining labor unions from aiding or abetting any person or persons to occupy or hold, without right, any house or other property of plaintiffs, West Virginia nonunion coal mine owners and operators, *held* not improper; persons so withholding houses intended for employees of plaintiff being trespassers under law of West Virginia.

**15. Landlord and tenant ⬤⇒144—Coal mine employees, refusing to surrender houses after quitting work, are "trespassers" under law of West Virginia.**

Under law of West Virginia, coal mine employees, quitting work and refusing to surrender houses occupied by them, become "trespassers."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Trespasser.]

**16. Equity ⬤⇒65(2)—Nonunion coal mine operators held not in pari delicto with labor union in action to restrain interference with business.**

Nonunion coal mine operators, who had for a time operated on a union basis and paid the "check-off" to the union, *held* not in pari delicto with labor union and others engaged in unlawful conspiracy to restrain interstate trade, so as to preclude relief in injunction suit.

Appeals from the District Court of the United States for the Southern District of West Virginia, at Charleston; George W. McClintic, Judge.

Action by the Red Jacket Consolidated Coal & Coke Company against the International Organization, United Mine Workers of America, and others, heard with eleven other consolidated cases. Decree in each case for plaintiffs, and defendants appeal. Affirmed.

These are twelve suits instituted by various owners and operators of coal mines in West Virginia, against the International Organization, United Mine Workers of America, the district and local unions of that organization in West Virginia, and various of its international, district, and local officers and members, who are named as defendants in the several suits. Complainants are 316 in number, embracing most of the coal companies operating on a nonunion basis in what is known as the Southern West Virginia field. The suits are instituted to restrain interference with business of complainants by the union and its members, on the ground that such interference constitutes a restraint of interstate trade and commerce in violation of the Sherman Act (Comp. St. § 8820 et seq.).

The International Organization, United Mine Workers of America, is an unincorporated labor organization of the United States and Canada, having a membership of 475,000, or approximately 75 per cent. of all persons working in or around coal mines, coal washeries, and coke ovens on the American continent. It is recognized by a large percentage of the mines of the United States, which are known as Union mines and are operated on the "closed union shop" basis; that is to say, no laborers are employed in or about such mines who are not members of the union. Complainants operate their mines nonunion on the "closed nonunion shop" basis; that is, their employees are notified that the company will not employ union men and accept employment with that understanding, and in the case of most of them the employees have entered into contracts that they will not join the union while remaining in the service of the employer. Complainants operate in what is

probably the most important nonunion coal field of the United States. Their combined annual tonnage amounts to over 40,000,000 tons, 90 per cent. or more of which is shipped out of West Virginia in interstate commerce. The controversy involved in the several suits is not a controversy between complainants and their employees over wages, hours of labor, or other cause, but is a controversy between them as nonunion operators and the international union, which is seeking to unionize their mines.

The suit of the Red Jacket Coal Company was instituted September 30, 1920. That company operates in Mingo county, W. Va., in the Williamson-Thacker field, which is and has always been nonunion territory. A strike was declared by the union in this field about July 1, 1920, in an attempt to unionize it, and the suit was instituted to enjoin the union and its officers and members from interfering with the company's employees by violence, threats, intimidation, picketing, and the like, or by procuring them to breach their contracts with plaintiff in the manner enjoined in Hitchman Coal Co. v. Mitchell, 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461. The suit of the Borderland Coal Company was instituted September 26, 1921. This company also operates in Mingo county, and it asks injunctive relief, not only in behalf of itself, but also in behalf of 62 other companies operating in the same territory, who were actually made parties to the suit on April 8, 1922. Shortly prior to the institution of the Borderland suit, armed union miners to a number variously estimated at between 5,000 and 7,000 had congregated at Marmet, W. Va., had announced their intention of marching across Logan county and into Mingo county with the avowed purpose of unionizing that field, and had actually engaged in a pitched battle with state officers, as a result whereof martial law had been declared and federal troops had been sent into the territory to preserve the peace. In this suit practically the same relief is sought as in the Red Jacket suit.

On April 1, 1922, while the strike order of July 1, 1920, in the Williamson-Thacker field was still outstanding and the efforts of the union in that field were being continued, the union called a nation-wide strike because of its failure to reach a basic wage agreement with the union operators of the central competitive field (Illinois, Indiana, Ohio, and Western Pennsylvania). This strike was declared to apply to nonunion as well as to union miners, and measures were taken to make it effective throughout the Williamson-Thack-

er, Winding Gulf, and Greenbrier fields of West Virginia, which had always been nonunion, as well as in the Kanawha and New River fields, where the union had for a time been recognized, but where operation had been commenced on the "closed nonunion shop" basis under contracts between the operators and their employees. Violence, threats, intimidation, and interference with contract were resorted to, and nine suits were instituted by the nonunion operators to enjoin the union, its officers and members, from interfering with their employees and the operation of their mines, and asking the same relief as was asked in the Red Jacket and Borderland suits. In each of these suits a number of companies operating in the same general neighborhood joined as complainants, and, as heretofore stated, 62 companies operating in the Williamson-Thacker field joined as complainants in the Borderland suit which had been instituted sometime prior thereto.

Temporary injunctions were obtained in all of these suits. In a number of them appeals were taken to this court, and the injunctive orders of the District Court were modified. Keeney et al. v. Borderland Coal Corporation et al., 282 F. 269; Dwyer v. Alpha Pocahontas Coal Co. et al. and four other cases, 282 F. 270; International Organization, United Mine Workers of America et al. v. Leevale Coal Co. et al., 285 F. 32.

The general strike of 1922 was settled by the Cleveland wage agreement of August of that year, but the strike was continued against the nonunion operators of West Virginia. Upon the making of the wage agreement, certain companies, which had joined as complainants in some of the bills, entered into wage agreements recognizing the union, and withdrew as complainants. On September 18, 1922, a bill was filed in behalf of the Carbon Fuel Company and a number of others against the defendants in the other cases and the companies who had withdrawn from the suits as complainants, asking not only that the same relief be awarded as was asked in the other suits, but also that these companies be enjoined from paying to the United Mine Workers the "check-off" provided for in their contract; that is, a certain sum from the wages of each miner employed which the contract provided should be paid to the union. A preliminary injunction was granted, which, on appeal, was modified by this court. International Organization, United Mine Workers of America, v. Carbon Fuel Co. et al., 288 F. 1020.

On May 21, 1923, the District Court entered an order consolidating all twelve of the

cases pending; and the defendants, having already moved to dismiss in the various cases for misjoinder of parties plaintiff, objected to the consolidation, and excepted to the order directing same. A great mass of evidence was then taken, which, with the pleadings and affidavits, covers 5,000 pages of the printed record. The District Judge, on October 16, 1925, made an extended finding of facts, which was filed as a part of the record in each case, and in each case entered the same final decree, from which the defendants have appealed.

The District Judge found, among other things, that defendants had conspired to restrain interstate trade and commerce in coal, and that at the time these suits were instituted the United Mine Workers of America, its officers, agents, representatives, and members were attempting "(a) unlawfully, maliciously, and unreasonably to induce, incite, and cause the employees of the plaintiffs in said suits, respectively, to violate their said contracts of employment with said plaintiffs; (b) to compel said employees of said plaintiffs by use of force, intimidation, threats, violence, vile epithets, abusive language, and false and fraudulent statements, to cease working for said plaintiffs and to become members of said union; (c) to compel the plaintiffs to recognize said International Organization, United Mine Workers of America, and to deal with it and operate their mines under closed shop contracts with it, including the 'check-off' provisions, or to close down their mines." He further found that it was a part of the policy and plan of the union to have members thereof obtain, keep, and hold possession of dwelling houses belonging to complainants, which were constructed and maintained by them for the use of their employees as incidental to such employment, and were absolutely necessary to the operation of their mines, and that the union was maintaining persons in the wrongful occupation of such houses for the purpose of preventing the houses being used by persons who were willing to work, and for the purpose of harassing complainants' nonunion employees.

Upon these findings a final decree was entered in each case, the effective provisions of which are those approved by this court in the Carbon Fuel Case, 288 F. 1020. By this decree defendants are restrained and enjoined:

"(1) From interfering with the employees of the plaintiffs or with men seeking employment at their mines by menaces, threats, violence, or injury to them, their persons, families, or property, or abusing them, or their families, or by doing them violence in any way or manner whatsoever, or by doing any other act or thing that will interfere with the right of such employees and those seeking employment to work upon such terms as to them seem proper, unmolested, and from in any manner injuring or destroying the properties of the plaintiffs, or either of them, or from counseling or advising that these plaintiffs should in any way or manner be injured in the conduct and management of their business and in the enjoyment of their property and property rights.

"(2) From trespassing upon the properties of the plaintiffs, or either of them, or by themselves, or in co-operation with others, from inciting, inducing, or persuading the employees of the plaintiffs to break their contract of employment with the plaintiffs.

"(3) From aiding or assisting any other person or persons to commit or attempt to commit any of the acts herein enjoined.

"(4) From aiding or abetting any person or persons to occupy or hold without right, any house or houses or other property of the plaintiffs, or any of them, by sending money or other assistance to be used by such persons in furtherance of such unlawful occupancy or holding."

The defendants filed twenty-eight assignments of error, which present five principal contentions for consideration by this court: (1) That the evidence does not establish a conspiracy in restraint of interstate trade and commerce in violation of the Sherman Act; (2) that there was misjoinder of parties plaintiff in the several suits and error in the order of consolidation; (3) that the injunctive decree is too broad, in that it forbids peaceful persuasion as well as violence and intimidation; (4) that the court should not have enjoined defendants from rendering assistance to persons to enable them to occupy or hold without right houses belonging to complainants; and (5) that those of complainants who had had wage agreements with the union were in pari delicto with defendants and therefore not entitled to relief. The point was made also that the court had no jurisdiction to award an injunction against defendants Lewis, Green, and Murray on the ground that they were not residents of the district, but this point seems to have been properly raised in no case except that of the Leevale Coal Company, and in that case the injunction did not run against these defendants. No direct question is raised by the appeal as to the legality of the "check-off"; for, while this matter is referred to in the findings of fact, the payment of the "check-off" is not enjoined by the decree.

William A. Glasgow, Jr., of Philadelphia, Pa. (Henry Warrum, of Indianapolis, Ind., and T. C. Townsend, of Charleston, W. Va., on the brief), for appellants.

R. S. Spilman and A. M. Belcher, both of Charleston, W. Va. (Edgar L. Greever, of Tazewell, Va., George S. Couch, of Charleston, W. Va., and Samuel M. Austin, of Lewisburg, W. Va., on the brief), for appellees.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

PARKER, Circuit Judge (after stating the facts as above). The first question for our consideration is whether the evidence establishes a conspiracy in restraint of interstate trade and commerce, in violation of the Sherman Act. This inquiry goes not merely to the propriety of the granting of the injunction, but to the very existence of the power to grant it; for, except in the case of the Red Jacket Coal Company, the jurisdiction of the court in all of the cases rests, not upon diversity of citizenship, but upon the fact that they arise under the laws of the United States. Complainants ask an injunction under the Clayton Act (38 Stat. 730) to prevent injuries threatened in the carrying out of a conspiracy violative of the Sherman Act. Unless, therefore, there is shown a conspiracy violative of the Sherman Act, no case is shown arising under the laws of the United States, and the jurisdiction of the court is at an end. [1] With the importance of the question in mind, we have given the most careful consideration to the evidence bearing thereon, and we should say in the outset that we do not think that the evidence sustains some of the conclusions which counsel for complainants seek to draw therefrom, or the interpretation they would have us place upon certain of the findings of the learned District Judge with regard to this matter. In the first place, we do not think that the International Organization, United Mine Workers of America, constitutes of itself an unlawful conspiracy in restraint of interstate trade and commerce because it embraces a large percentage of the mine workers of this country or because its purpose is to extend its membership so as to embrace all of the workers in the mines of the continent. It may be conceded that the purposes of the union, if realized, would affect wages, hours of labor, and living conditions, and that the power of its organization would be used in furtherance of collective bargaining, and that these things would incidentally affect the production and price of coal sold in interstate commerce. And it may be con-

ceded further that by such an extension of membership the union would acquire a great measure of control over the labor involved in coal production. But this does not mean that the organization is unlawful. Section 6 of the Clayton Act, 38 Stat. 731 (Comp. St. § 8835f), provides:

"That the labor of a human being is not a commodity or article of commerce. Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws."

As pointed out in Duplex Printing Press Co. v. Deering et al., 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, this section does not exempt a labor union or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade, as, in that case, the carrying on of a secondary boycott; but the section does declare the normal objects of labor unions to be legitimate, and forbids their being held to be combinations or conspiracies in restraint of trade because they are organized or because of the normal effect of such organization on interstate commerce. As said by the Supreme Court in the case just cited, 254 U. S. at 469 (41 S. Ct. 177):

"The section assumes the normal objects of a labor organization to be legitimate, and declares that nothing in the Anti-Trust Laws shall be construed to forbid the existence and operation of such organizations or to forbid their members from *lawfully* carrying out their *legitimate* objects; and that such an organization shall not be held in itself—merely because of its existence and operation—to be an illegal combination or conspiracy in restraint of trade."

And, speaking to the same point in the later case of American Foundries v. Tri-City Council, 257 U. S. 184, 209, 42 S. Ct. 72, 78 (66 L. Ed. 189, 27 A. L. R. 360), the court said:

"Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A sin-

gle employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share of division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood."

What is said in this case as to the effect of the standard of wages on competition between employers applies in the coal industry, not to a restricted neighborhood, but to the industry as a whole; for in that industry the rate of wages is one of the largest factors in the cost of production, and affects not only competition in the immediate neighborhood but that with producers throughout the same trade territory. The union, therefore, is not to be condemned because it seeks to extend its membership throughout the industry. As a matter of fact, it has been before the Supreme Court in a number of cases, and its organization has been recognized by that court as a lawful one. United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 385, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. We have no hesitation, therefore, in holding that the defendants are not guilty of a conspiracy in restraint of trade merely because of the extent and general purpose of their organization.

[2, 3] As pointed out in the case of the Duplex Printing Press Co. v. Deering, supra, however, when the union turns aside from its normal and legitimate objects and purposes and engages in an actual combination or conspiracy in restraint of trade, it is accountable therefor in the same manner as any other organization; and we think that the evidence adduced in this case justifies the conclusion that the defendants have engaged in an actual combination and conspiracy in restraint of trade in a manner quite foreign to the normal and legitimate objects of the union. In this connection, it is not necessary that we consider whether complainants have established a conspiracy between the United Mine Workers and the operators of the central competitive field, or whether the acts of which complaint is made were done in furtherance of such conspiracy, for we think that the evidence sustains the finding of the District Judge that a combination or conspiracy existed among the defendants themselves, without regard to participation by the central operators, to restrain and interfere with the interstate business of complainants. By this we do not mean, of course, that the union was unlawful of itself, but that defendants as officers of the union had combined and conspired to interfere with the production and shipment of coal by the nonunion operators of West Virginia, in order to force the unionization of the West Virginia mines and to make effective the strikes declared pursuant to the policy of the union. The presence of this nonunion field in West Virginia has been a hindrance to the union in its every contest with the operators. It has furnished arguments to the operators in wage negotiations, and in time of strike has furnished coal which has supplied in part the needs of the country and weakened the effect of the strike. Since 1898 the union officials have recognized the importance of unionizing this field, and, with the exception of an interim during the World War, have been engaged in an almost continuous struggle to force its unionization through interference with the business of the nonunion operators. They have called strikes from time to time for this express purpose, and have spent hundreds of thousands of dollars in interfering with their business.

[4] And there can be no question that the strikes called by the union in the nonunion fields of West Virginia in 1920 and 1922, and the campaign of violence and intimidation incident thereto, were merely the carrying out of the plan and policy upon which the defendants had been engaged for a number of years. In May, 1920, at a time when there was no general strike, union organizers were sent into the nonunion Williamson-Thacker field, and in July following a strike was called for the avowed purpose of organizing the field. The armed march of the succeeding year was made by union miners for the purpose, among other things, of organizing nonunion territory. The nation-wide strike of 1922 was made applicable to the nonunion

field of West Virginia by proclamation of union officials, and representatives of the union began interfering with the employees of nonunion operators for the purpose of forcing the closing down of nonunion mines. When the strike of 1922 was settled by the Cleveland wage agreement, the interference with these nonunion operators was continued. The District Judge has found that the conspiracy existed, and that the acts complained of were done pursuant thereto. We think that these findings are sustained by the evidence; and the rule is well settled that the findings of the trial judge should not be disturbed unless it clearly appears, either that he misapprehended the evidence or has gone against the clear weight thereof, or, in other words, unless we are satisfied that his findings were clearly wrong. Wolf Mineral Process Corporation v. Minerals Separation North American Corporation (C. C. A. 4th) decided this term; McKeithan Lumber Co. v. Fidelity Trust Co. (C. C. A. 4th) 223 F. 773; U. S. v. U. S. Shoe Machinery Co., 247 U. S. 32, 41, 38 S. Ct. 473, 62 L. Ed. 968; Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356.

[5] Defendants say, however, and this seems to be their chief contention on this point, that the mining of coal is not interstate commerce, and that a conspiracy to interfere with the operation of coal mines is not a conspiracy to restrain or interfere with interstate commerce. In this connection they rely chiefly upon the decisions of the Supreme Court in the first Coronado Case, 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, and in United Leather Workers v. Herkert, 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566. But we do not think that either of these decisions is in point. The Leather Workers Case involved a strike by laborers in trunk factories, and it was held that the fact that the trunks, when manufactured, were to be shipped or sold in interstate commerce did not make their production a part thereof. The Coronado Case, it is true, involved the mining of coal; but the court, being under the impression that the coal produced by plaintiff amounted to only 5,000 tons a week, held that a conspiracy directed against production of so small an amount could not be said to be a conspiracy to restrain interstate commerce, even though the coal was intended, if produced, for shipment in such commerce. When the Coronado Case went to the Supreme Court the second time, however (268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963), the court adverted to this basis of its former decision and stated that upon the second trial it had been shown

that the capacity of plaintiff's mines was substantially more than 5,000 tons per day. It held that this, with other evidence as to intent, made a case for the jury as to conspiracy to restrain interstate commerce. The court then proceeded to lay down the rule which we think is applicable here, as follows:

"The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act. United Mine Workers v. Coronado Co., 259 U. S. 344, 408, 409, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; United Leather Workers v. Herkert, 265 U. S. 457, 471, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566; Industrial Association v. United States, 268 U. S. 64, 45 S. Ct. 403, 69 L. Ed. 849. We think there was substantial evidence at the second trial in this case tending to show that the purpose of the destruction of the mines was to stop the production of nonunion coal and prevent its shipment to markets of other states than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines."

[6,7] We think there can be no question that the case at bar falls within the rule just quoted from the second Coronado decision. Here it appears that the total production of the mines of complainants is in excess of 40,000,000 tons per year, more than 90 per cent. of which is shipped in interstate commerce. Interference with the production of these mines as contemplated by defendants would necessarily interfere with interstate commerce in coal to a substantial degree. Moreover, it is perfectly clear that the purpose of defendants in interfering with production was to stop the shipments in interstate commerce. It was only as the coal entered into interstate commerce that it became a factor in the price and affected defendants in their wage negotiations with the union operators. And, in time of strike, it was only as it moved in interstate commerce that it relieved the coal scarcity and interfered with the strike. A conspiracy is in violation of the statute, where there exist an intent to restrain interstate trade and commerce and a scheme appropriate for that purpose, even though it does not act directly up-

on the instrumentalities of commerce. Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; U. S. v. Reading Co., 226 U. S. 324,. 33 S. Ct. 90, 57 L. Ed. 243; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; United States v. Brims, 47 S. Ct. 169, 71 L. Ed. ——. And where the necessary result of the things done pursuant to or contemplated by the conspiracy is to restrain trade between the states, the intent is presumed. United States v. Reading Co., supra, at page 370. Defendants must be held "to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary. In other words, by purposely engaging in a conspiracy which necessarily and directly produces the result which the statute is designed to prevent, they are, in legal contemplation, chargeable with intending that result." U. S. v. Patten, 226 U. S. 525, 543, 33 S. Ct. 141, 145 (57 L. Ed. 333, 44 L. R. A. [N. S.] 325); Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 243, 20 S. Ct. 96, 44 L. Ed. 136.

In the very recent case of U. S. v. Brims, cited above, the Supreme Court dealt with an indictment for a conspiracy between manufacturers, contractors, and laborers, pursuant to which the manufacturers and contractors agreed to employ only union carpenters and these in turn agreed not to install nonunion-made millwork. The Circuit Court of Appeals reversed a conviction in the case, saying: "The restriction was not against the shipment of millwork into Illinois. It was against nonunion-made millwork produced in or out of Illinois." This decision, however, was reversed in turn by the Supreme Court, and the conviction was sustained on the ground that all parties intended that the outside competition should be cut down and interstate commerce thereby impeded. The court said:

"They wished to eliminate the competition of Wisconsin and other nonunion mills, which were paying lower wages and consequently could undersell them. Obviously it would tend to bring about the desired result if a general combination could be secured under which the. manufacturers and contractors would employ only union carpenters with the understanding that the latter would refuse to install nonunion-made millwork. And we think there is evidence reasonably tending to show that. such a combination was brought about, and that, as intended by all the parties, the so-called outside competition was cut down, and thereby interstate commerce directly and materially impeded."

The Brims Case is directly in point. There the conspiracy affected interstate commerce by its effect upon consumption, here by its effect upon production; but in both cases the conspiracy was intended to operate upon matters not directly connected with transportation or sale in interstate commerce, and in both cases interstate commerce was intended to be affected and was necessarily affected by what was done. We think, therefore, that in the light of this recent decision there can be no doubt that the conspiracy established by the testimony was one in restraint of interstate trade and commerce in violation of the Sherman Act. See, also, Bedford Cut Stone Co. et al. v. Journeymen Stone Cutters' Association of North America et al., 47 S. Ct. 522, 71 L. Ed. ——, decided by the Supreme Court April 11, 1927.

[8] The next question is whether there was a misjoinder of parties plaintiff in the several suits or error in the order of consolidation. We think not. The contention of defendants is that under the Sherman Act a private individual has no right to injunctive relief to restrain violations thereof; that section 16 of the Clayton Act (Comp. St. § 8835o) merely authorizes suits by private parties against threatened loss or damage; that the right thus conferred is the right to protect the private business of the individual complainant; that in the cases at bar, therefore, each of the complainants is seeking to protect his individual business; and that there is no common right whose protection is sought by the suits. But while it is true that the protection sought by the various complainants is the protection of the individual business of each, it by no means follows that there is lacking that common interest in the subject-matter of the litigation which justifies joinder under the practice in equity. There is but one conspiracy on the part of defendants, and that conspiracy is directed against the business of complainants as a class, not because of any of the individual characteristics of the various businesses, but because they are operating on the nonunion basis within a certain territory. The acts of interference shown are not sporadic or occasional, but show clearly an organized attempt to interfere with the business of all nonunion operators within that territory Acts of interference, done pursuant to the conspiracy not only hinder the individual operator against whom they are directed, but, because done. pursuant to the conspiracy, constitute a threat and menace to all other nonunion operators in the territory. The questions involved in all of the cases, therefore, are the same, and the evidence is practically the same.

That bearing on the existence of the conspiracy is identical in all of the cases, and that which deals with acts done in carrying out the conspiracy is of the same general character, and is admissible in all of the cases as showing, if not injury, the reasonableness of the apprehension of injury. It would be most unjust for complainants, being the objects of this joint attack made against them jointly, to be denied the right of seeking jointly the protection of the courts; and it would be absurd for the courts to require that there be presented in 316 different cases against the same parties a question which could be determined in a single case.

"Courts of equity have always exercised a sound discretion in determining whether parties are properly joined in a suit. Their object has been to adopt a course which will best promote the due administration of justice without multiplying unnecessary litigation on the one hand or drawing suitors into needless and oppressive expenses, and confusing the courts with many issues on the other." Rowbotham v. Jones, 47 N. J. Eq. 337, 20 A. 731, 19 L. R. A. 663.

As said by Mr. Justice McLean, in dealing with the same subject in Fitch v. Creighton, 24 How. 159, 164 (16 L. Ed. 596):

"Every case must be governed by its circumstances; and, as these are as diversified as the names of the parties, the court must exercise a sound discretion on the subject. Whilst parties should not be subjected to expense and inconvenience in litigating matters in which they have no interest, multiplicity of suits should be avoided by uniting in one bill all who have an interest in the principal matter in controversy, though the interests may have arisen under distinct contracts."

[9] In disposing of such an objection to five bills filed by 62 fire insurance companies against the insurance commissioner of the state of California to restrain acts alleged to be illegal, Judge Morrow, in Liverpool & London & Globe Ins. Co. v. Clunie (C. C.) 88 F. 160, 167, laid down what we conceive to be the correct rule applicable in such cases. He said:

"A court of equity will, in a single suit, take cognizance of a controversy, determine the rights of all the parties, and grant the relief requisite to meet the ends of justice in order to prevent a multiplicity of suits, where a number of persons have separate and individual claims and rights of action against the same party, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter may be settled in one action brought by all these persons uniting as coplaintiffs."

Professor Pomeroy, after an exhaustive discussion of the question and of the cases in which it has been considered, says:

"Under the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised, either on behalf of a numerous body of separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title,' nor 'community of right' or of 'interest in the subject-matter,' among these individuals, but where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body. In a majority of the decided cases, this community of interest in the questions at issue and in the kind of relief sought has originated from the fact that the separate claims of all the individuals composing the body arose by means of the same unauthorized, unlawful, or illegal act or proceeding. Even this external feature of unity, however, has not always existed, and is not deemed essential. Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy." Pomeroy's Equity Jurisprudence (4th Ed.) § 269.

See, also, Tate v. Ohio & Mississippi R. Co., 10 Ind. 174, 71 Am. Dec. 309; Turner v. Hart, 71 Mich. 128, 38 N. W. 890, 15 Am. St. Rep. 243; First Nat. Bank. of Mt. Vernon v. Sarlls, 129 Ind. 201, 28 N. E. 434, 13 L. R. A. 481, 28 Am. St. Rep. 185, 188; Strobel v. Kerr Salt Co., 164 N. Y. 303, 58 N. E. 142, 51 L. R. A. 687, 79 Am. St. Rep. 643, 654; Pillsbury-Washburn Flour Mills Co. v. Eagle (C. C. A. 7th) 86 F. 608, 41 L. R. A. 162; R. R. Kitchen & Co. v. Local Union, 91 W. Va. 65, 112 S. E. 198; Goldfield Consol. Mines Co. v. Richardson et al. (C. C.) 194 F. 198, 206; American Smelting & Refining Co. v. Godfrey (C. C. A. 8th) 158 F. 225, 14 Ann. Cas.

8; Osborne v. Wisconsin Cent. R. Co. (C. C. opinion by Justice Harlan) 43 F. 824; 20 R. C. L. 676; note 71 Am. Dec. p. 311 et seq.

Of the cases cited, Kitchen v. Local Union, supra, is directly in point. In that case 59 different employers of labor joined in a suit as complainants against 90 defendants embracing 10 labor organizations and their officials, alleging conspiracy on the part of defendants and asking an injunction to restrain them from threatened interference with business of complainants. Defendants demurred to the bill on the ground of misjoinder and multifariousness. In sustaining the bill, the Supreme Court of Appeals of West Virginia said:

"In view of the common interest each unit of each group has in the prosecution of his or its business, opposed and affected in common with all the others, by an organized and plenary effort conducted on the part of the defendants, if the allegations are true, by unlawful means, all may unite in one bill to restrain and prevent the use of the unlawful means and methods so employed. If, by the use of such methods, directed and applied to the business of each of the plaintiffs, all are prevented from prosecution of their respective enterprises, they are all similarly affected by the same illegal cause, wherefore they may unite in resisting it, and there is no misjoinder of parties plaintiff."

The whole question, we think, is settled, so far as the federal courts are concerned, by rule 26 of the New Equity Rules, which provides:

"The plaintiff may join in one bill as many causes of action, cognizable in equity, as he may have against the defendant. But when there are more than one plaintiff, the causes of action joined must be joint, and if there be more than one defendant the liability must be one asserted against all of the material defendants, *or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice.* If it appear that any such causes of action can not be conveniently disposed of together, the court may order separate trials." (Italics ours.)

[10] It is earnestly contended by defendants, however, that the portion of the rule which we have italicized applies only to the uniting of causes against defendants where there are more than one defendant, and has no application to cases where there are more than one plaintiff, and that in the case of plaintiffs the rule requires that the causes of action joined must be joint. We cannot accept this interpretation. The purpose of the equity rules

was to liberalize and not restrict the practice in equity, and it certainly could not have been intended to forbid joinder in cases where, although the causes of action were not joint, the convenient administration of justice would be promoted and where for years the propriety of such joinder to prevent a multiplicity of suits had been recognized. The clause "or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice" must, we think, be construed as alternative to the specific provision allowing joinder in the case of more than one plaintiff, as well as to the specific provision allowing joinder in the case of more than one defendant. Rule 26 is not to be construed as prohibitive of anything which was permissible before its adoption. Low v. McMaster (D. C.) 255 F. 235.

[11] What we have said as to joinder virtually disposes of the exceptions to the order of consolidation. By the Act of July 22, 1813, R. S. § 921, U. S. C. tit. 28, § 734 (Comp. St. § 1547), it is provided:

"When causes of a like nature or relative to the same question are pending before a court of the United States, or of any territory, the court may make such orders and rules concerning proceedings therein as may be conformable to the usages of courts for avoiding unnecessary costs or delay in the administration of justice, and may consolidate said causes when it appears reasonable to do so."

Under this statute there can be no question that the consolidation was a matter resting in the sound discretion of the trial judge, and that under the circumstances of the case the order of consolidation was proper. Mutual Life Ins. Co. v. Hillmon, 145 U. S. 285, 12 S. Ct. 909, 36 L. Ed. 706; American Window Glass Co. v. Noe (C. C. A. 7th) 158 F. 777; Toledo, etc., R. Co. v. Continental Trust Co. (C. C. A. 6th) 95 F. 497.

In their criticism of the scope of the injunction, defendants make complaint of the restraints contained in paragraphs 2 and 4. As the language criticised is that approved by this court in International Organization, United Mine Workers of America et al. v. Carbon Fuel Co. et al., 288 F. 1020, we might content ourselves with referring to that decision as the law of the case in the Carbon Fuel Case now before us and as binding authority in the other cases; but we shall go further and say that in the light of the decisions of the Supreme Court we have no doubt as to the correctness of the paragraphs criticised.

[12] With respect to the second paragraph, complaint is made that it restrains defendants "from inciting, inducing, or persuading the

employees of the plaintiffs to break their contract of employment with the plaintiffs." This language is certainly not so broad as that of the decree approved by the Supreme Court in Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 261, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, which also enjoined interference with the contract by means of peaceful persuasion. The doctrine of that case has been approved by the Supreme Court in the later cases of American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360, and United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, and applied by this court in Bittner v. West Virginia-Pittsburgh Coal Co., 15 F.(2d) 652, by the Circuit Court of Appeals of the Eighth Circuit in Kinloch Telephone Co. v. Local Union, 275 F. 241, and by the Circuit Court of Appeals of the Ninth Circuit in Montgomery v. Pacific Electric Ry. Co., 293 F. 680.

It is said, however, that the effect of the decree, which, of course, operates indefinitely in futuro, is to restrain defendants from attempting to extend their membership among the employees of complainants who are under contract not to join the union while remaining in complainants' service, and to forbid the publishing and circulating of lawful arguments and the making of lawful and proper speeches advocating such union membership. They say that the effect of the decree, therefore, is that, because complainants' employees have agreed to work on the nonunion basis, defendants are forbidden, for an indefinite time in the future, to lay before them any lawful and proper argument in favor of union membership.

If we so understood the decree, we would not hesitate to modify it. As we said in the Bittner Case, there can be no doubt of the right of defendants to use all lawful propaganda to increase their membership. On the other hand, however, this right must be exercised with due regard to the rights of complainants. To make a speech or to circulate an argument under ordinary circumstances dwelling upon the advantages of union membership is one thing. To approach a company's employees, working under a contract not to join the union while remaining in the company's service, and induce them, in violation of their contracts, to join the union and go on a strike for the purpose of forcing the company to recognize the union or of impairing its power of production, is another and very different thing. What the decree forbids is this "inciting, inducing, or persuading the em-

18 F.(2d)—54

ployees of plaintiff to break their contracts of employment"; and what was said in the Hitchman Case with respect to this matter is conclusive of the point involved here. The court there said:

"But the facts render it plain that what the defendants were endeavoring to do at the Hitchman mine and neighboring mines cannot be treated as a bona fide effort to enlarge the membership of the union. There is no evidence to show, nor can it be inferred, that defendants intended or desired to have the men at these mines join the union, *unless they could organize the mines*. Without this, the new members would be added to the number of men competing for jobs in the organized districts, while nonunion men would take their places in the Panhandle mines. Except as a means to the end of compelling the owners of these mines to change their method of operation, the defendants were not seeking to enlarge the union membership. * * * Another fundamental error in defendants' position consists in the assumption that all measures that may be resorted to are lawful if they are 'peaceable'— that is, if they stop short of physical violence, or coercion through fear of it. In our opinion, any violation of plaintiff's legal rights contrived by defendants for the purpose of inflicting damage, or having that as its necessary effect, is as plainly inhibited by the law as if it involved a breach of the peace. A combination to procure concerted breaches of contract by plaintiff's employees constitutes such a violation."

[13] The inhibition of section 20 of the Clayton Act (Comp. St. § 1243d) against enjoining peaceful persuasion does not apply, as this is not a case growing out of a dispute concerning terms or conditions of employment, between an employer and employee, between employers and employees, or between employees, or between persons employed and persons seeking employment; but is a case growing out of a dispute between employers and persons who are neither ex-employees nor seeking employment. In such cases, section 20 of the Clayton Act has no application. American Foundries v. Tri-City Council, 257 U. S. 184, 202, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 471, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Bittner v. West Virginia-Pittsburgh Coal Co. (C. C. A. 4th) 15 F.(2d) 652, 658.

[14, 15] The principal criticism of paragraph 4 of the decree is that it violates paragraph 20 of the Clayton Act, but, as we have seen above, that section has no application to a

case such as this. We see no other reason why paragraph 4 of the decree is not proper. Under the law of West Virginia, when the employees of complainants quit work and refuse to surrender the houses of complainants occupied by them, they become trespassers on complainants' property. Angel v. Black Band Consol. Coal Co., 96 W. Va. 47, 122 S. E. 274, 35 A. L. R. 568. The effect of the fourth paragraph of the decree is to enjoin defendants from aiding and abetting such persons in occupying or holding without right houses belonging to complainants, or in other words, from aiding and abetting in trespasses committed on complainants' property in furtherance of the design of the conspiracy. It is clear that no more effective way of shutting down the mines could be devised than to get the houses of the mine villages in possession of persons who refuse to work in the mines and withhold possession of the houses from persons who are willing to work.

[16] The basis of the contention that certain of the complainants are in pari delicto with the defendants and therefore not entitled to relief, as we understand the contention, is that those complainants operated on the union basis for a number of years and paid the "check-off" to the union. This contention assumes two propositions, (1) that the "check-off" is illegal and in furtherance of the conspiracy; and (2) that, once having been parties to the conspiracy, complainants cannot withdraw therefrom and be protected against it when it is directed against them. Without following this argument into all of its ramifications, it is sufficient to say that we see nothing to connect these complainants with the conspiracy except their payment of the "check-off," and we see nothing of itself illegal in the "check-off," nor do we think that, by agreeing to the "check-off," they became parties to the conspiracy of defendants. As said in Gasaway v. Borderland Coal Co. (C. C. A. 7th) 278 F. 56, 65:

"So far as the contracts themselves and this record disclose, the check-off is the voluntary assignment by the employee of so much of his wages as may be necessary to meet his union dues, and his direction to his employer to pay the amount to the treasurer of his union. In that aspect the contract provision is legal, and quite evidently there are many lawful purposes for which dues may be used."

It follows that, while we do not approve of all of the findings of fact made by the District Court, we think that the decree entered in the several cases was sustained by the evidence and same is accordingly affirmed.

Affirmed.

These cases were heard by the three Circuit Judges. The late Judge ROSE concurred in the decision that the decrees of the District Court should be affirmed. He expressed a desire, however, to examine the record with a view of satisfying himself whether jurisdiction existed as to the defendants Lewis, Green, and Murray. He died before the opinion could be submitted to him.